**UNITED STATES of America,
Appellee,**

v.

**Rudolph IZZI, Appellant.**

**No. 521, Docket 34133.**

United States Court of Appeals,
Second Circuit.

Argued March 11, 1970.

Decided April 20, 1970.

Certiorari Denied June 29, 1970.

See 90 S.Ct. 2244.

Jack Kaplan, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, on the brief), for appellee.

Thomas J. Todarelli, New York City (Sabbatino & Todarelli, and Henry J. Boitel, New York City, on the brief), for appellant.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

Appealing from his conviction for the interstate transportation of stolen secu-rities, Rudolph Izzi alleges that the intro-duction of handwriting exemplars exe-cuted at the demand of the government, in conjunction with testimony that he had intentionally varied his handwriting, violated his privilege against self-in-crimination. He also claims that the trial court's denial of his numerous re-quests for delays precluded a fair trial and that the government failed to prove the elements of the crime.

On this appeal from a judgment of conviction based upon a jury verdict, we must take that view of the evidence most favorable to the government. United States v. Kahaner, 317 F.2d 459 (2d Cir. 1963). Most of the testimony centered on the events of January 25, 1967. Izzi's first encounter on that date involved, somewhat prophetically, a brush with the law. When Izzi was 100 miles within Pennsylvania, he was stop-ped for speeding at 8:40 a. m. while driving west on the Pennsylvania Turn-pike. The appellant was driving a new Cadillac registered in New York, and was accompanied by one Joyce Cottone, a resident of New York. In an effort to get on his way, Izzi volunteered to the trooper that he was hurrying to an im-portant appointment in Gettysburg, Pennsylvania; nevertheless, he was tak-en before a local justice of the peace, who summarily fined him $15. This small episode completed, Izzi proceeded on to Gettysburg arriving before noon at the Gettysburg Motor Lodge where he registered under the pseudonym "R. Randolph."

Also staying at the Motor Lodge on this day was one John Marken, an offi-cer of Bankers and Telephone Employees Insurance Co. (BTEICo.). Marken had been told to expect the arrival of a "Mr. Randolph" who would deliver to him 2600 shares of International Business Machines stock required for a BTEICo. recapitalization program. Shortly after Izzi's arrival at the motel, the two met and Izzi transferred to Marken 26 100-share certificates of IBM common stock. These certificates, worth more than $1,000,000, were registered in the name

of Hayden, Stone & Co., a firm of New York stockbrokers, and constituted part of a group of 50 certificates which had mysteriously disappeared from the firm's New York headquarters in July or August 1966. After the Gettysburg transaction, the 26 certificates were taken by Marken's attorney to the Pennsylvania Insurance Commissioner for inspection and placed in a safe deposit box at the Harrisburg National Bank and Trust Co. The Commissioner had been insisting on a substantial infusion of new capital into BTEICo.

The use of the certificates by BTEICo. was uncovered in February 1967, and the shares were seized by the FBI on February 24, 1967, pursuant to a search warrant. Approximately a week later Izzi disappeared and, although a warrant for his arrest was issued March 8, 1967, he remained at large until May 3, 1968, when he voluntarily surrendered to the authorities. Izzi's indictment for interstate transportation of stolen property of a value greater than $5000, in violation of 18 U.S.C. § 2314, had been filed more than a year prior to his surrender. He was convicted on April 11, 1969 following a one-week trial before Judge Mansfield and a jury, and sentenced to eight years' imprisonment.

I.

Izzi claims that the handwriting exemplars he was required to execute shortly before commencement of his trial were the subject of impermissible comment by the government and its witnesses. With only the "R. Randolph" motel registration card and several specimens of Izzi's own signature on which to base his judgment, the government handwriting expert was apparently unable to make a conclusive determination that Izzi had written the signature on the card. Accordingly, one week before the trial, the government secured a court order compelling Izzi to provide handwriting exemplars or "standards." It is apparent to the eye that the "R. Randolph" signatures executed by Izzi in compliance with this order in the presence of his counsel are noticeably less fluent than his normal signature. Izzi does not ask us to hold that the mere introduction of these exemplars at trial violated his fifth amendment privilege against self-incrimination. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), forecloses this line of attack. Instead, he contends that the government improperly emphasized the differences between Izzi's normal signature and the exemplars, intentionally suggesting that he had attempted to disguise his normal handwriting and by so doing had indicated consciousness of guilt. It is this implied admission which Izzi alleges was wrung from him in violation of the fifth amendment. Although Izzi's claim that the government sought to make use of an alleged acknowledgment of guilt arising from the compelled execution of handwriting exemplars constitutes an ingenious attempt to avoid the thrust of Gilbert, we find it to be unsupported by the record.[1]

1. We are therefore not required to confront the problems, difficult both conceptually and practically, which would be presented had Izzi made out his claim that the government had *intentionally* sought to capitalize on an implied admission arising from an alleged attempt to disguise his handwriting in executing exemplars under coercion of a court order. The basis for the decision in *Gilbert* that exemplars are not protected by the fifth amendment privilege was that they are not "testimonial." The lines drawn on the paper, although they may constitute words, are devoid of testimonial content. The process of executing the exemplar does, however, contain an element of testimony. In furnishing the requested sample, the writer inevitably makes the implied statement that "this is my normal handwriting." *Gilbert* represents an apparent determination that this element of testimony is insufficient to bring handwriting exemplars within the ambit of the privilege against self-incrimination. If an accused were free to disguise his handwriting, by writing the requested words in block capitals or with his opposite hand, without fear of any sanction, exemplars would be worthless and the authorization to compel their execution granted by *Gilbert*, illusory.

Neither the testimony of the government witnesses nor the argument of the prosecutor contained an accusation that Izzi had sought to disguise his handwriting in executing the exemplars. Webb, the government's handwriting expert, attempted to account for the absence of a characteristic feature of Izzi's handwriting in the exemplars by pointing out that the exemplars had been written "much slower." In cross-examination of Osborn, the defendant's expert, the prosecutor sought to impeach Osborn's testimony relating to differences between the exemplars and the "R. Randolph" signature on the motel registration card (the inference suggested by the defense being that they did not have a common author), by drawing his attention to the differences between the exemplars and Izzi's "normal," "fluent" signatures.

■ Under *Gilbert*, the government may compel the execution of handwriting exemplars and introduce them into evidence in order to determine the authorship of another writing. If *Gilbert* is not to be rendered meaningless, the government must be allowed to explain differences between the exemplars and the signature sought to be identified, particularly where the defense points to these differences as evidence of non-common authorship.

## II.

■ Izzi also contends that the district court's denial of his series of requests for delay commencing shortly before the trial and continuing until its conclusion prevented him from countering the government's handwriting evidence effectively and from establishing an "alibi" defense. The result, he argues, was to deny him due process of law. Izzi complains that the prosecutor failed to notice the taking of the exemplars until six days before trial, did not provide his expert with convenient facilities for examination of the exemplars

and the accompanying report, and further impeded the expert's preparation by never disclosing which signatures would be introduced at trial. While we would have preferred greater generosity on the part of the prosecutor, any inconveniences occasioned were not insurmountable; nor did they prejudice Izzi. He had ample opportunity to engage a handwriting expert, and the expert prepared an enlightening exhibit which illustrated his testimony. That the government's failure to introduce into evidence certain of the signatures portrayed in the defense exhibit necessitated last-minute alterations is hardly a basis for the claim that Izzi was denied a fair trial.

■ The "alibi" defense and, consequently, the request for a continuance in order to establish it merit only brief mention. Izzi sought to prove his "alibi" by a series of calculations linked to a chain of inferences which he insists would have shown that he could not have arrived at the Gettysburg Motor Lodge before 10:30 a. m. But, even if established, this theory would have availed him naught, for the government's case did not rest on proof that Izzi had arrived at any specific hour on the morning of January 25. The claimed "alibi" defense was, in short, no defense at all, and the request for a continuance to prove it, whimsical.

## III.

Izzi's final argument is that the government failed to prove the elements of the crime charged in the indictment. Specifically, he charges that the certificates were not shown to have been stolen, that there was no proof he transported them across state lines, and that, even if stolen, he was not shown to have had knowledge of this. The evidence established, however, that on July 13, 1966 the certificates transported by Izzi were logged into the locked and guarded "cage" where securities were kept at the New

York offices of Hayden, Stone & Co. There is no record of their being removed, such as would have existed, under Hayden, Stone procedures, if the removal had been authorized. An extensive search of the "case," involving 40 employees, virtually negated any possibility that they had been misplaced within its confines. This unexplained disappearance of carefully-handled, closely-guarded documents suffices to support an inference of theft. United States v. Owens, 420 F.2d 305 (2d Cir. 1970).

Moreover, there was sufficient evidence from which it could be inferred that Izzi's journey had begun in New York. His car was registered there, and his lady companion was a resident of Manhattan who lived there with one of her children. Her telephone call from the motel to the New York City apartment where the child was staying suggests that her departure had been recent. Finally, when apprehended by the Pennsylvania state trooper, Izzi was driving west, away from New York. Once it is established that Izzi's point of departure had been within New York, the inference that he transported the securities, which were stolen in New York, from that state to Pennsylvania follows logically.

█ Similarly, the evidence offered a basis for the conclusion that Izzi knew the certificates to have been stolen. The possession of recently stolen merchandise lends support to an inference of knowledge. See United States v. DeSisto, 329 F.2d 929, 935 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); Boehm v. United States, 271 F. 454 (2d Cir. 1921) (gaps of four and nine months between theft and possession). Izzi's use of an assumed name in Gettysburg also serves to establish his awareness that he was not a mere messenger transporting legally-acquired securities for use in an ordinary business transaction. We see no reason to disturb the verdict.

Affirmed.