**UNITED STATES of America,**
**Appellee,**

v.

**Stanley M. FISTEL, Appellant.**

**No. 608, Docket 71–2196.**

United States Court of Appeals,
Second Circuit.

Argued March 8, 1972.

Decided May 17, 1972.

H. Richard· Uviller, New York City (Abraham Glasser, New York City, on brief), for appellant.

John H. Gross, New York City, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., and John W. Nields, Jr., Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON, District Judge.*

JAMESON, District Judge:

Appellant, Stanley M. Fistel, was charged in a single-count indictment with unlawfully and knowingly possessing nine $100,000 United States Treasury Bills which had been unlawfully taken from Manufacturers Hanover Trust Company, in violation of 18 U.S.C. § 2113(c).[1] He was convicted, following jury trial, and sentenced to eight years imprisonment.

Appellant contends that (1) the indictment is void for failure to state an offense; (2) the evidence was insufficient on the elements of the stolen character of the bills and his scienter; (3) the eight year sentence is illegal and un-

---

* Senior District Judge of the District of Montana, sitting by designation.

1. 18 U.S.C. § 2113(c) provides:
"Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, * * * in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker."

§ 2113(b) reads in pertinent part:
"Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, * * * shall be fined not more than $5,000 or imprisoned not more than ten years, or both; * * *."

just; and (4) the court erred in denying his motion for a new trial.

### Summary of Evidence

Vincent Mathushek, a posting clerk for the Manufacturers Hanover Trust Company, testified that according to the bank records the nine bills found in appellant's possession were received at the bank on July 23 and 27, 1970, and there was no record that they had ever left the bank's custody lawfully. On July 28, 1970 it was discovered that 17 $100,000 bills, including the nine in appellant's possession, were missing.[2] Five employees searched the bank for two days but were unable to find the bills. A "lost securities" alert was then sent to other banks.

Willis E. Walton, an F.B.I. agent, testified that on November 10, 1970 he and Agent Witkowski, while working undercover, were introduced to Fistel in Schrafft's Restaurant in Manhattan. Fistel, who was using the alias "Nat Gold", offered to sell Walton $1,000,000 in treasury bills for 25 "points" or $250,000. Walton stated that he "couldn't pay 25 points," but "was willing to offer 20 points." Fistel replied that he didn't think "his people" would "buy that." Fistel left the room and upon his return stated that he had made a phone call to "his people", and that "20 per cent was acceptable."

Later an envelope containing treasury bills was delivered to Fistel at the restaurant.[3] Walton and Witkowski examined the envelope, and Witkowski then left. Walton found only nine bills and was informed by Fistel that the tenth bill had been sold.

Walton and Fistel then proceeded by taxi to Manufacturers Hanover Trust Company where Walton had his money. On the way Walton told Fistel he was "skeptical" about Fistel's statement regarding the tenth bill and was worried that the "stuff was counterfeit or there would be a switch along the way." Fistel told Walton not to worry, that the "stuff" was stolen and that "there was a large amount more available."

Prior to entering the bank Walton examined the bills more closely and found they were listed in a "stolen bank flier" in his possession.[4] He was assured again by Fistel that the bills "have been stolen; they are not counterfeit."

After entering the bank vault Fistel again stated that the bills had been stolen.[5] He also wrote the name "Nat Gold" and his address on the back of the bank flier, so that Walton "could reach him from overseas or through telephonic contact", in case Walton "had to make another offer or deal with him." Walton then showed Fistel some money he had in a safety deposit box, and shortly thereafter other F.B.I. agents entered the vault room and arrested Fistel.

F.B.I. Agent Harry Gossett testified that he was posing as a vault employee and was among the arresting agents.

---

2. Mathushek worked in the "broker section" of the bank and was in charge of the posting sheets for one broker (Merrill Lynch). At the close of each day he would "prove out" by telephoning the broker and comparing records. On the evening of July 27 Merrill Lynch's account had "proved out", but on July 28 a shortage of $1,700,000 in April 21, 1971 treasury bills was revealed. Mathushek then determined the serial numbers of the missing bills by comparing the purchase and sale slips involving this issue.

3. Prior thereto Fistel had shown Walton a xerox copy of a $100,000 treasury bill, which he stated was one of the ten he was offering for sale.

4. Walton clipped the corner off one of the bills in order to be able to identify it.

5. Walton testified that on this occasion Fistel said, "Don't worry. As I said before, these things are stolen. If this deal goes through according to our plans, there is six hundred to seven hundred thousand dollars more worth of that that I can let you have as soon as this transaction is over, or after you return. There is an unlimited amount that I can get my hands on, if you can dispose of it." He also wrote the numbers six hundred to seven hundred on the back of the envelope containing the bills.

While listening at the door before entering the vault Gossett heard "Fistel saying something to the effect that Special Agent Walton needn't consult his list any further, that these items were listed there, and that he had six more which would also appear on that list."

Fistel, a lawyer, called two character witnesses and took the stand himself. He testified that on November 10, 1970 he was asked by Frank Goran, manager of Fistel's insurance brokerage corporation, located in the same suite as Fistel's law office, to represent Goran "in drawing up some legal papers for the return of certain securities which a client had received through a mistaken delivery and which was being returned for remuneration, 15 per cent of its face value." It seemed to Fistel "a perfectly legal transaction." Later the same day Goran told Fistel "an appointment had been made for Nat Gold to meet some people, and that he wanted me to go instead because I would be able to draw up the agreement." Goran asked Fistel to "renegotiate" in order to "get more money for the return of these securities, an extra five or ten per cent" and gave Fistel a copy of one of the bills.

Fistel testified that he went to Schraffts with a Jack Kramer, who introduced him to two men, one of whom was Agent Walton. He was under the impression that both men were representatives of a bank or insurance company. After some negotiation Walton "agreed to an extra five per cent." Fistel offered to take Walton to Fistel's office "so you can meet my client and conclude your business transaction with him." Walton "absolutely refused" and "insisted that the securities be brought to him so he can take them to the bank to be validated." Goran brought the securities to the restaurant. Fistel accompanied Walton to the bank, where he was arrested.

Fistel denied using Nat Gold as an alias or stating that the securities were stolen. When asked why he had written the name Nat Gold with his office address and telephone number on the flier he explained that Goran had told him to have them "get in touch with Nat Gold" if there were any questions.[6]

## Is the Indictment Void?

■ Appellant contends, for the first time on appeal, that the indictment is void for failure to charge an offense in that it "charges the scienter only in the words 'knowing the said treasury bills to have been taken from a bank'" and omits the essential allegation that the taking was "in violation of subsection (b)."[7] The Government argues that the indictment "adequately, if inartfully, charges Fistel with the requisite guilty knowledge." The indictment was not only "inartfully" drawn; it was clearly defective in omitting the essential element of "intent to steal or purloin" required to state an offense under § 2113(b). Had appellant filed a motion

6. Fistel testified that the address and telephone number he had written on the bank flier were his own; that Nat Gold was associated with Goran in setting up a corporation to adjust fire losses and used the same office. He could not recall whether he had ever met Gold but said he talked with him once or twice on the phone. Goran had been killed a few months earlier in a struggle over a gun.

7. The indictment reads:
"The Grand Jury charges:
"On or about the 10th day of November, 1970, in the Southern District of New York, STANLEY M. FISTEL, the defendant, unlawfully, wilfully and knowingly did have in his possession property and a thing of value of more than $100.00, to wit:
Nine $100,000.00 United States Treasury Bills
which had been unlawfully taken and carried away from the care, custody, control, management and possession of the Manufacturers Hanover Trust Company, 40 Wall Street, New York, New York, a bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, knowing the said treasury bills to have been taken from a bank.
(Title 18, United States Code, Section 2113(c))"

to dismiss the indictment prior to trial, dismissal would have been required.

It is true, of course, that the failure of an indictment to charge an offense may be presented "any time during the pendency of the proceeding." Rule 12, F.R.Crim.P. However, "the courts of the United States long ago withdrew their hospitality toward technical claims of invalidity of an indictment first raised after trial, absent a clear showing of substantial prejudice to the accused —such as a showing that the indictment is 'so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had.'" United States v. Thompson, 356 F.2d 216, 226 (2 Cir. 1965) cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L. Ed.2d 675 (1966).[8]

While the indictment here does not allege that the bills were taken in violation of § 2113(b) or were taken "with intent to steal", it does allege that appellant "unlawfully, wilfully and knowingly" had in his possession bills "which had been unlawfully taken and carried away" from a bank, "knowing the said treasury bills to have been taken from a bank." This language sufficiently defines conduct made criminal by § 2113(c), and particularly the element of scienter, to survive post-trial attack in the absence of some showing of prejudice.

We find no showing of prejudice. Appellant, a lawyer himself, was represented by competent, retained counsel. As in *Thompson*, the case was tried upon the clear understanding that it was necessary for the Government to prove that the securities were stolen from a bank, and that Fistel knew they were stolen. This was recognized at all stages of the proceedings.[9] In particular, it was expressly recognized by defense counsel in his summation. In referring to what the Government must prove under the indictment he said in part: "In order to sustain a conviction for Mr. Fistel the government must prove what they say in this indictment that these securities were carried away and stolen from a bank, that Mr. Fistel knew they were stolen, and knew they were stolen from the bank. * * * Well Mr. Fistel has to know that they are stolen, according to this indictment, before he can be convicted of anything."

The court charged the jury in pertinent part:

"Now, in order to convict Mr. Fistel of wilful and knowing possession of these nine treasury bills, you must find beyond a reasonable doubt that he knew that these treasury bills, which he admits he possessed for a time on November 10, 1970, had been taken or carried away from a bank by someone who had the intention to

---

8. In *Thompson* the defendant was charged with violating 18 U.S.C. § 2113(a), entering a bank with intent to commit a felony affecting the bank. The intended felony was "the taking of money in excess of $100.00 from the said bank", a violation of 18 U.S.C. § 2113(b). The indictment did not allege that the intended taking was with "intent to steal." This court noted that the omission of the essential element of "intent to steal" would have warranted corrective action by the district court on a timely motion to dismiss, but affirmed the conviction in view of the fact that the case was tried upon the clear understanding that the "felony affecting such bank" was the offense specified in § 2113(b) and "there was no prejudice."

9. In his demand for a bill of particulars appellant requested the Government to state whether it would rely upon any evidence other than Fistel's own admissions to establish that he knew the bills were stolen. After the Government's opening statement, appellant moved to dismiss on the ground that counsel had not indicated that the Government would prove that Fistel knew the notes were stolen. At the close of the Government's case, appellant moved to dismiss on the ground, *inter alia*, that there was no evidence aside from his own admissions that Fistel knew the bills were stolen. A similar motion was made at the close of all the evidence.

steal, or as it is sometimes put, purloin those bills from a bank."

The cases of United States v. Roach, 321 F.2d 1, 3–4 (3 Cir. 1963) and United States v. Harris, 346 F.2d 182, 184 (4 Cir. 1965) lend support to appellant's position. Both cases hold that the mere allegation that money was "taken" from a federally insured bank without alleging that the taking was in violation of § 2113(b) renders an indictment under § 2113(c) "fatal" (*Roach*) or "faulty" (*Harris*). Neither opinion states when the defendants first challenged the indictments. In *Roach*, the Government conceded that the § 2113(c) count was defective, 321 F.2d at 3, and that the trial court erroneously instructed the jury that it could find *Roach* guilty on all counts, thus convicting him of "concealing and possessing" the same money he had taken. Id. at 6. In *Harris*, in addition to a faulty indictment, the court failed to instruct the jury adequately as to the elements of the offense. 346 F.2d at 184.

To the extent that the *Roach* and *Harris* cases may stand for the proposition that the omission of the "in violation of subsection (b)" language renders the indictment void, regardless of when the defect is raised and the lack of prejudice to the accused, they would be inconsistent with the holding of this court in United States v. Thompson, *supra*, to which we adhere in this case.

### Sufficiency of Evidence

Appellant contends further that under the facts in this case it was impossible for the Government to "bring in an indictment containing the requisite allegations of scienter" because it is not known "how the securities became missing" from the bank. For the same reason it is contended that the evidence was insufficient to sustain a jury finding that anyone had taken the securities

with the "intent to steal or purloin" them. This argument is premised on the contention that § 2113(b) reaches only "larcenous" takings and that "there is at least as good a speculative likelihood that the securities were *embezzled* as that they were taken larcenously." It is argued further that a separate statute, 18 U.S.C. § 656, governs embezzlement by bank officials or employees, and this statute "does not cover receivers or possessors."

In our opinion appellant's narrow construction of the words "steal or purloin" is not warranted. In construing the National Motor Vehicle Theft Act [10] in United States v. Turley, 352 U.S. 407, 410–413, 77 S.Ct. 397, 400, 1 L.Ed.2d 430 (1957), the Supreme Court held that the word "stolen" included embezzlement and other felonious takings with intent to deprive the owner of rights and benefits of ownership. Pointing out that "stolen" has no accepted common-law meaning, the Court continued:

"Furthermore, 'stolen' and 'steal' have been used in federal criminal statutes, and the courts interpreting those words have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes. Freed from a common-law meaning, we should give 'stolen' the meaning consistent with the context in which it appears."

■ This court in construing the words "with intent to steal or purloin" as used in the National Stolen Property Act [11] held that "the statute is applicable to any taking whereby a person dishonestly obtains goods or securities belonging to another with the intent to deprive the owner of the rights and benefits of ownership." United States v. Handler, 142 F.2d 351, 353 (2 Cir.) cert. denied, 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594 (1944).[12] We reach the same conclusion

---

10. Commonly known as the Dyer Act, 18 U.S.C. § 2312.

11. 18 U.S.C. § 415 (1940 ed.) ; now 18 U.S.C. § 2314.

12. See also United States v. De Normand, 149 F.2d 622 (2 Cir.), cert. denied, 326 U.S. 756, 66 S.Ct. 89, 90 L.Ed. 454 (1945), construing 18 U.S.C. § 409.

with respect to the words "steal or purloin" as used in § 2113(b) and hold that this section covers embezzlement by a bank official or employee and other takings with intent to deprive the owner of permanent use of the property taken.[13]

Under this construction of § 2113(b), there was ample evidence to support the jury's finding of guilt.[14] Appellant admitted that the bills were stolen. He assured Walton that they were included on the list (in Walton's possession) of securities missing from the bank. He used an alias while attempting to sell a large quantity of readily negotiable securities for twenty per cent of their value. While there was no direct evidence that the bills were stolen, the "unexplained disappearance of carefully-handled, closely-guarded documents suffices to support an inference of theft." United States v. Izzi, 427 F.2d 293, 297 (2 Cir.), cert. denied 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 794 (1970). Each day at the close of business the bank made a count and "proved out" the securities it held for Merrill Lynch. Merrill Lynch's account had "proved out" on July 27. There is no record that the treasury bills were ever delivered to anyone. They were missing at the close of business on July 28. The jury could properly infer that they had been taken from the bank by someone who had the intention to steal them.

■ We find no merit in appellant's contention that the eight year sentence is illegal and subject to review by this court. The statute under which he was convicted prescribes a maximum sentence of ten years.[15] This court has no power to modify a sentence imposed by the district court within the limits allowed by statute. United States v. Rosenberg, 195 F.2d 583, 604–608 (2 Cir.), cert. denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952).

*Motion for New Trial*

Prior to sentencing appellant moved for a new trial on the ground of newly discovered evidence. In support of this motion he submitted the affidavit of Diane Cassano, a former secretary for one of his companies. The affidavit corroborated certain details of Fistel's testimony, i. e., that Nat Gold was engaged in the fire loss adjustment business with Frank Goran, had an office in the same suite with Fistel, and used the same telephone number. Mrs. Cassano also stated that she had "personally met Nat Gold and had personally seen Nat Gold in the said office on several occasions."

■ The trial court did not abuse its discretion in denying the motion for a new trial. As the court stated, the proposed testimony was "not newly discovered evidence." Fistel's counsel knew in advance of the trial that Walton would testify that Fistel had used the alias Nat Gold. There is no suggestion that Mrs. Cassano could not have been produced at the trial. At most her affidavit simply corroborated Fistel's testimony that a Nat Gold did in fact exist and

13. We recognize that it was held in United States v. Rogers, 289 F.2d 433, 437 (4 Cir. 1961), that § 2113(b) "reaches only the offense of larceny as that crime has been defined by the common law", and in LeMasters v. United States, 378 F.2d 262 (9 Cir. 1967), that § 2113(b) does not include obtaining money under false pretenses. Although not precisely in point factually, the following cases support the holding of this court that the word "stolen" as used in § 2113(b) has a broader meaning than common law larceny and includes embezzlement and other unlawful takings from a bank: Thaggard v. United States, 354 F.2d 735 (5 Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct.

1222, 16 L.Ed.2d 301 (1966); Chapman v. United States, 346 F.2d 383, 387 (9 Cir.), cert. denied, 382 U.S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (1965); United States v. Pruitt, 446 F.2d 513 (6 Cir. 1971).

14. It is obvious that the jury accepted the testimony of Agents Walton and Gossett and rejected appellant's defense.

15. The five year maximum sentence for embezzlement under 18 U.S.C. § 656 does not govern the offense of possessing property in violation of § 2113(c) even though the property may have been stolen by embezzlement.

occupied an office in the same suite with Fistel. It did not in any way contradict Walton's testimony.

 In order to justify the granting of a new trial the newly discovered evidence must be "such as would probably produce an acquittal." Brown v. United States, 333 F.2d 723, 724 (2 Cir. 1964); United States v. On Lee, 201 F.2d 722, 724 (2 Cir.), cert. denied 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953). The proffered evidence did not approach this exacting standard. Clearly it did not "so touch the central issue in the case as to require a new trial." United States v. Faustin, 371 F.2d 820, 821 (2 Cir.), cert. denied 387 U.S. 935, 87 S.Ct. 2062, 18 L.Ed.2d 998 (1967).

Affirmed.