UNITED STATES of America, Appellee,

v.

Alfred HINTON, Defendant-Appellant.

No. 313, Docket 82–1209.

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1982.

Decided March 22, 1983.

Certiorari Denied June 13, 1983.
See 103 S.Ct. 3091.

Richard I. Rosenkranz, Brooklyn, N.Y., for defendant-appellant.

Peter Chavkin, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brian E. Maas and Vivian Shevitz, Asst. U.S. Attys., Brooklyn, N.Y., of counsel) for appellee.

Before MOORE,* CARDAMONE and PIERCE, Circuit Judges.

---

\* Leonard P. Moore died on December 7, 1982. He participated in the oral argument in this case and voted to dispose of the case in the manner set forth in this opinion, although he was unable to concur in the opinion itself.

PIERCE, Circuit Judge:

## I.

■ The principal issue on this appeal is whether conduct which may constitute larceny by false pretenses is encompassed within 18 U.S.C. § 2113(b) (1976), which provides that "whoever takes and carries away, with intent to steal or purloin, any property or money" belonging to a federally insured bank commits a federal crime. As we held in *United States v. Fistel,* 460 F.2d 157, 163 (2d Cir.1972), the federal bank robbery statute prohibits a broader range of conduct than common law larceny, and covers all "takings with intent to deprive the owner of permanent use of the property taken." Finding this, as well as the defendant's remaining contentions without merit, we affirm his conviction.

## II.

On August 18, 1981, Joseph Skolnik mailed a $5,000.00 check from his home in Long Beach, New York, to the investment firm of E.F. Hutton in Manhattan. The check was drawn on Skolnik's bank, the Central Federal Savings & Loan Association of Nassau County, New York, to his own order, and endorsed by him in blank on the back. The investment firm never received the check and consequently never credited Skolnik's account.[1]

On September 1, 1981, the appellant Alfred Hinton opened an account at the Republic National Bank, Brooklyn, New York, in the name of Joseph Skolnik. He signed a savings account signature card using the name of Joseph Skolnik, supplied a City of New York employee identification card bearing the name of Joseph Skolnik and the picture of Alfred Hinton, and deposited a small amount of cash. On Sep-

tember 3, 1981, Hinton returned to the bank and deposited Skolnik's $5,000.00 check, which Hinton had apparently acquired wrongfully.[2]

Over the next five days, Hinton withdrew approximately $3,500.00 from the "Skolnik" account, signing the name "Joseph Skolnik" to the withdrawal slips. On September 11, 1981, the appellant was arrested at the same branch of the Republic National Bank. He had in his possession various articles, including a passbook and withdrawal slips for the "Skolnik" account.

Appellant was indicted in a single count indictment on October 13, 1981, for possessing a check which he knew was stolen from an authorized depository for United States mail, in violation of 18 U.S.C. § 1708 (1976). The case was scheduled for trial on April 19, 1982, and during the interim period plea bargaining discussions occurred between the appellant's assigned counsel and the government's attorney, at which time defense counsel confronted the Assistant United States Attorney with a perceived defect in the government's case with regard to the knowing possession of stolen mail from an authorized mail depository.

On April 2, 1982, the assigned counsel was permitted to withdraw from the case at Hinton's request, and new counsel was appointed. On April 13, 1982, the appellant was arraigned on a superseding indictment which added a second count charging appellant with stealing from a bank insured by the Federal Deposit Insurance Corporation (F.D.I.C.), in violation of 18 U.S.C. § 2113(b).

On April 16, 1982, the district court conducted a hearing in connection with appellant's written motion to dismiss Count Two. The movant alleged (1) prosecutorial vindictiveness, (2) ineffective assistance of coun-

---

1. A supervisor for the Bankers Trust Company testified that the pre-addressed envelopes used for payments to E.F. Hutton accounts are delivered to a "lock-box" area of Bankers Trust where Bankers Trust, authorized agents for E.F. Hutton, would process the checks.

2. At trial, Hinton testified that he had acquired the $5,000 check on a Brooklyn street corner

from a man known to him as "Infinite," and that he was told by Infinite that Skolnik had given him the check and that Skolnik wanted to have it negotiated while he reported the check to be lost. On cross-examination, Hinton stated that for his efforts he was supposed to receive one-third of the check's proceeds.

sel, (3) a breach of Fed.R.Crim.P. 11(e)(6)(C) and (D) concerning the use of statements made during plea negotiations, and (4) a violation of the Speedy Trial Act, 18 U.S.C. § 3161(b) (1976).[3] This motion was premised on Hinton's contention that his first assigned counsel had compromised his defense by revealing to the prosecution, during plea negotiations, that the government would find it difficult to prove that the check was in Hinton's possession with knowledge that it was stolen from an authorized United States mail depository. Thereafter, the government's attorney proceeded to seek the superseding indictment, which charged appellant with a violation of 18 U.S.C. § 2113(b). Hinton contended that the government would not have sought the superseding indictment had it not been apprised of the defect in its case.

In connection with appellant's motion to dismiss the superseding indictment, the district judge received an affidavit from the government, held a hearing to inquire into the motives of the Assistant United States Attorney in seeking the superseding indictment, and received an affidavit from Hinton's first counsel, recounting his recollection of the plea bargaining discussions. On April 19, 1982, the court denied the motion.

Following a two-day trial which commenced on that date, the jury returned a verdict finding the defendant not guilty of Count One (possession of stolen mail), but guilty of Count Two (stealing from a federally insured bank). The appellant was sentenced to a term of three years' imprisonment on Count Two.

## III.

Appellant was convicted under the Federal Bank Robbery Act, 18 U.S.C. § 2113(b), which provides in pertinent part:

> Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, . . . or [in the] possession of any bank, . . . shall be fined

not more than $5,000 or imprisoned not more than ten years, or both . . . .

Appellant contends that the activity for which he was convicted constitutes obtaining property by false pretenses, a non-common-law offense, which he claims is not covered by the Federal Bank Robbery Act. Appellant's contention stems from the theory that the statute's language "whoever takes and carries away, with intent to steal or purloin" by definition relates to trespassory takings which are considered larceny at common law. *See, e.g.,* R. Perkins and R. Boyce, *Handbook on Criminal Law* 292 (3d ed. 1982); W. LaFave and A. Scott, Jr., *Handbook on Criminal Law* 618, 622 (1972); J. Miller, *Handbook on Criminal Law* 340–41 (1934). Appellant argues that the statute covers only common-law offenses.

We believe that Hinton's activities are indeed appropriately considered taking by false pretenses, since Hinton obtained both property and title, *i.e.,* the money, with the consent of the bank, albeit consent procured by a fraudulent representation. However, we reject appellant's contention that his activities are not covered by section 2113(b) since we believe that the statutory language of this section has a broader scope of coverage than common-law larceny and includes theft by false pretenses.

The statutory language of the Act does not require a narrow interpretation of the scope of the offenses limited solely to common-law larceny. In *United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), the Supreme Court interpreted the word "stolen" in section 2312 of the National Motor Vehicle Theft Act, or "Dyer Act,"[4] which makes it a crime to transport a motor vehicle across state lines with knowledge that it is a stolen vehicle. The Court, after reviewing the history of the words "steal" and "stolen," declined to limit the interpretation of these words to common-law larceny, finding that " 'stolen' (or 'stealing') has no accepted common-law meaning." *Id.* at 411, 77 S.Ct. at 399. The Court stated:

---

**3.** Appellant has not renewed his Speedy Trial Act violation claim on appeal.

**4.** National Motor Vehicle Theft Act of 1919, 18 U.S.C. § 2312 (1976).

Furthermore, "stolen" and "steal" have been used in federal criminal statutes, and the courts interpreting those words have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes. Freed from a common-law meaning, we should give "stolen" the meaning consistent with the context in which it appears.

352 U.S. at 412–13, 77 S.Ct. at 399–400. (Footnote omitted.)

Relying on *Turley's* interpretation of "steal" and "stolen," this circuit has construed section 2113 of the Federal Bank Robbery Act in a broad fashion to include the non-common-law offense of embezzlement. In *United States v. Fistel,* 460 F.2d 157 (2d Cir.1972), a bank employee was charged with embezzling nine $100,000 United States Treasury bills from the Manufacturers Hanover Trust Company and was convicted under 18 U.S.C. § 2113(c).[5] Since section 2113(c) provides that a violator thereof shall be subject to the punishment provided by section 2113(b), this court found it necessary to interpret section 2113(b). We held that the language of subsection (b) had a broader meaning than common-law larceny and included embezzlement as well as other unlawful takings. 460 F.2d at 162–63.

The majority of circuit courts which have addressed the issue of the scope of section 2113(b) have also held that the Act is not limited to common-law offenses. Those courts have relied on *Turley's* broad construction of the words "steal" and "stolen," and have interpreted the statute as covering a number of non-trespassory thefts. *See, e.g., United States v. Shoels,* 685 F.2d

379, 382–83 (10th Cir.1982) (theft by false pretenses), *petition for cert. filed,* No. 82–5550 (U.S. Oct. 8, 1982); *United States v. Bell,* 678 F.2d 547, 548–49 (5th Cir.1982) (en banc) (same), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); *United States v. Simmons,* 679 F.2d 1042, 1049 (3d Cir.1982) (check forging scheme), *petition for cert. filed sub nom. Brown v. United States,* —— U.S. ——, 103 S.Ct. 3117, —— L.Ed.2d (1982); *United States v. Khamis,* 674 F.2d 390, 394 (5th Cir.1982) (withdrawing funds from worthless check); *United States v. Guiffre,* 576 F.2d 126, 128 (7th Cir.) (withdrawing funds from stolen and forged checks), *cert. denied,* 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978).[6]

Examination of the legislative history of the 1937 amendment, which added burglary and larceny to the Federal Bank Robbery Act, in conjunction with that relating to the original 1934 Act, indicates to us that Congress did not intend to limit the type of offenses proscribed solely to common-law larceny. Indeed, following its original enactment in 1934, Congress sought to expand the scope of the Act in order to protect the assets of federally insured banks from a broad range of thefts. That year, the Senate introduced a bill to provide punishment for certain offenses committed against national banks. The bill provided that anyone who "by force or violence, or by putting into fear, feloniously takes or . . . attempts to take . . . any property or money" from a bank shall be subject to a fine of $5,000, ten years imprisonment, or both. The bill also prohibited burglary and the taking of property "with the consent of the bank obtained by the offender by any trick, artifice, fraud, or false or fraudulent representation." S. 2841, 73d Cong., 2d Sess., 78 Cong.Rec. 5738

---

**5.** 18 U.S.C. § 2113(c) provides:

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any property or money or other thing of value knowing the same to have been taken from a bank, or credit union or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

**6.** Those courts which have espoused a narrow construction of section 2113(b) have not found

the *Turley* analysis to be persuasive, but rather have concluded from their interpretation of the statute's legislative history that Congress intended to limit the applicable offenses to common-law larceny. *See, e.g., United States v. Feroni,* 655 F.2d 707, 711 (6th Cir.1981); *LeMasters v. United States,* 378 F.2d 262, 266 (9th Cir.1967); *United States v. Rogers,* 289 F.2d 433, 437 (4th Cir.1961). *Accord, United States v. Sellers,* 670 F.2d 853, 854 (9th Cir.1982) (per curiam).

(1934). Thus, the Senate bill covered both common-law offenses and the non-common-law offense of theft by trick. However, the House of Representatives amended the bill by deleting the provisions covering burglary and theft by trick, artifice, fraud, etc., 78 Cong.Rec. 8132–33. As modified, the bill was enacted as amended on May 18, 1934.[7] The published history does not explain why burglary and takings by trick were deleted by the House. However, it is known that in enacting the 1934 Act, Congress intended to deter forcible takings and to aid state officials who were hindered in apprehending "gangsters who operate[d] habitually from one state to another in robbing banks." S.Rep. No. 537, 73d Cong., 2d Sess. 2 (1934); *See Jerome v. United States,* 318 U.S. 101, 102, 63 S.Ct. 483, 484, 87 L.Ed. 640 (1934).

During the next three years, Congress found the 1934 Act inadequate in that it did not apply to situations in which monies were stolen from federally insured banks without the use of force or violence. To address this shortcoming,[8] H.R. 5900 was introduced in the House of Representatives "[t]o amend the bank robbery statute to include burglary and larceny." 81 Cong. Rec. 2731 (1937). No mention was made of the specific concerns of gangsterism which had motivated the 1934 Congress. The 1937 amendment was drafted to protect federally insured banks from thefts which had the same effect as robbery.[9] The amendment prohibited the burglary of a bank, and made it a crime for anyone to "take out and carry away, with intent to steal or purloin, any property or money . . . [from a] bank." 81 Cong.Rec. 5376 (1937). This bill was enacted after minor amendments were made.[10]

These published legislative materials and the specific wording of the 1937 amendment indicate that Congress intended to expand the scope of the Act beyond common-law larceny. While the 1937 amendment did not resurrect the language regarding theft by "trick, artifice, fraud, or false or fraudulent representation" which had been deleted from the original bill enacted in 1934, the amendment, nonetheless, did delete language of the Act which clearly focused on common-law larceny, to wit: "tak[ing] . . . without the consent of [the] bank . . . with intent to convert . . . to the use of the individual . . . other than [the] bank." 78 Cong.Rec. 8132 (1934). It is evident that Congress' concern had shifted from the gangster activities mentioned in 1934 to that of protecting the reserves of federally insured banks. Clearly, these reserves would be affected by acts constituting theft by false pretenses just as they would through bank robbery. We conclude that use of the words "takes and carries away, with intent to steal or purloin," without a clear indication that Congress intended to limit the statute to common-law larceny, indicates that Congress did not intend to exclude non-trespassory thefts such as theft by false pretenses. *Accord, United States v. Shoels,* 685 F.2d 379 (10th Cir.1982), *petition for cert. filed,* No. 82–5550 (U.S. Oct. 8, 1982); *United States v. Simmons,* 679 F.2d 1042 (3d Cir.1982), *petition for cert. filed sub nom., Brown v. United States,* No. 82–5201 (U.S. Aug. 7, 1982); Note, *Determining the Proper Scope of Section 2113(b) of the Federal Bank Robbery Act,* 51 Fordham L.Rev. 536 (December 1982).

For the foregoing reasons, we hold that the words "takes and carries away, with intent to steal or purloin" in 18 U.S.C. § 2113(b) encompasses theft by false pretenses. Thus, Hinton's acts of unlawfully withdrawing funds from a federally insured bank fall within the scope of the section.

IV.

Hinton's second claim on appeal is that his first assigned counsel, without authority, disclosed to the Assistant United States

---

7. Federal Bank Robbery Act of 1934, (codified as amended at 18 U.S.C. § 2113 (1976)).

8. *See* S.Rep. No. 1259, 75th Cong., 1st Sess. 1–2 (1937); H.R.Rep. No. 732, 75th Cong., 1st Sess. 1–2 (1937).

9. *Id.*

10. Act of August 24, 1937, ch. 747, 50 Stat. 749.

Attorney an inherent weakness in the government's case with respect to the single-count indictment which charged possession of stolen mail in violation of 18 U.S.C. § 1708. He also contends that the government's use of this information in seeking a superseding two-count indictment which added a charge under the bank robbery statute, 18 U.S.C. § 2113(b), demonstrated prosecutorial vindictiveness and was a violation of appellant's due process rights. This claim is without basis in both fact and law.

■ Appellant claims that his counsel, in his zeal to obtain a reduced sentence, improperly confided to Assistant United States Attorney Chavkin that upon close examination of the $5,000 Skolnik check, Chavkin would find the markings of a stamp affixed by the Bankers Trust Company of New York. The presence of such a stamp would indicate that the check was actually delivered to the addressee and thus Hinton could not have stolen it from the mails.

Upon request of the government's attorney, Postal Inspectors examined the check in question and did not discover any markings to indicate that the check had been received by either Bankers Trust Company or E.F. Hutton. However, as Assistant United States Attorney Chavkin stated in his affidavit and in the proceedings below, the government became concerned as to whether it could prove a violation of section 1708. Apparently, the government recognized that the check could have been stolen while being processed at Bankers Trust. After discussion with others in his office, Chavkin decided that under the circumstances of this case, "it would be prudent also to indict Mr. Hinton under a statute that did not require proof that the check had been stolen from the mail." (Affidavit of Assistant United States Attorney Peter Chavkin, April 16, 1982).

The trial judge received affidavits from Hinton's first assigned counsel and from the government's attorney before conducting a hearing on Hinton's motion to dismiss Count Two. After oral argument, the trial judge found that there was no causal relationship between the government's action in bringing a superseding indictment and any alleged wrongful use of plea negotiations. The court further found that "the new indictment resulted from the prosecutor's entirely understandable concern over his ability to prove the mailing element of the charge." We believe that the trial judge did not commit plain error in his findings.

Hinton next argues that the Supreme Court decisions of *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) and *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) suggest that an "impermissible appearance of prosecutorial vindictiveness" is implied when the government at a later stage decides to indict for a more serious offense known to the government from the outset. However, both of these cases were recently reviewed and limited to their particular facts in *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

■ In *Goodwin,* the Court pointed out that the holdings of *Pearce* and *Blackledge* applied to a situation where the government attempts to bring more serious charges against a defendant *after the completion of a full trial* merely because the defendant had invoked his right to a jury trial. In such a situation, the Court found, the government's actions would carry a presumption of prosecutorial vindictiveness. *United States v. Goodwin,* 102 S.Ct. at 2489; *Bordenkircher v. Hayes,* 434 U.S. 357, 362, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978).

However, such a presumption of prosecutorial vindictiveness does not exist in a pretrial setting. *Goodwin,* 102 S.Ct. at 2493; *Bordenkircher,* 434 U.S. at 362–63, 98 S.Ct. at 667. In *Bordenkircher,* the Court held that the due process clause did not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against a defendant who refused to plead guilty to the offense with which he was originally charged. In *Goodwin,* the Court again held that there was no due process violation where the prosecutor sought an indictment and conviction of a

felony charge after the accused, in a pending related misdemeanor offense, refused to plead guilty and demanded a jury trial. The *Goodwin* Court stated, "A change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.... A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Id.* 102 S.Ct. at 2493. We find that even assuming counsel's disclosure prompted the government to seek a superseding indictment, these circumstances, occurring prior to trial, without more, do not warrant a presumption of prosecutorial vindictiveness. We therefore hold that the circumstances herein do not indicate a due process violation.

### V.

Appellant's remaining claims are without merit and can be disposed of summarily.

■ Hinton contends that any information disclosed during plea negotiations is barred from use by the government in seeking a superseding indictment pursuant to Fed.R.Crim.P. 11(e)(6)(C) and (D). We disagree. Rule 11(e)(6)(D) is not applicable to statements made by defense counsel about the strengths or weaknesses of the government's case. The rule does not prohibit the government from seeking to add further charges based upon evidence disclosed during plea negotiations. It simply makes inadmissible as evidence at trial statements made by a defendant in the course of plea discussions. *See* Fed.R.Crim.P. 11 advisory committee note. As the trial judge aptly stated in the proceeding below:

> Rule 11(e) was [not] intended to bar anything so ephemeral as the exploitation of weakness real or imagined concerning strategy, such as occurred here. Rule 11 ... [is] designed to [be] applied to statements that are to be used in evidence, or evidence obtained through the use or exploitation of the statements. Nothing of that sort happened here.

■ Appellant's final claim is that his pretrial motion to dismiss should have been granted due to a violation of his constitutional right to effective assistance of counsel. The trial judge, on the basis of affidavits submitted, found that Hinton's first assigned counsel had not acted improperly and was indeed authorized by his client to confront the government with the defect in its case. The district judge stated:

> I just don't find a basis for concluding that [counsel's] procedures or what he did were, in fact, unauthorized. But even if there was a misunderstanding between [counsel] and his client, as to whether the weakness in the government's case should be employed in an effort to secure a favorable disposition of the case, this amounts ... at most, to a disagreement as to tactics as to what would benefit Mr. Hinton in terms of overall result. I don't find that the judgment made by [counsel], under the circumstances, was unreasonable or showed a lack of competence.

This finding was not clearly erroneous. Counsel in a sworn affidavit stated he had thoroughly discussed with Hinton the possibility of seeking a reduced sentence after disclosing the inherent weakness in the government's case, and that it was Hinton who told him to "go for it." Thus, the trial judge could properly conclude that counsel's method of plea bargaining was not at all inappropriate. In any event, the government's attorney was free to seek a superseding indictment with one or more additional charges before the trial commenced, quite apart from any tangential information received from defense counsel.

The judgment of conviction is affirmed.