**UNITED STATES of America,**
**Appellee,**

v.

**Vincent Charles TERESA, Appellant.**

**No. 13641.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 7, 1969.

Decided Dec. 12, 1969.

John J. Pichinson, Corpus Christi, Tex., for appellant.

Alan I. Baron, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on brief), for appellee.

Before BOREMAN, BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge.

Defendant and Daniel Frank Mondavano were jointly indicted in a four-count indictment. In the first count they were charged, as principals and aiders and abettors, with transporting ten coupon bonds from Boston to Baltimore on or about April 16, 1968, knowing the bonds to have been stolen. The bonds, having an aggregate face value of $50,-000, were alleged to have been stolen from a New York bank. This count thus charged a violation of 18 U.S.C.A. § 2314.[1]

The second, third and fourth counts charged like crimes. The second count alleged the transportation, on or about May 1, 1968, of Treasury bills, notes and bonds and a Federal Home Loan Bank bond having an aggregate face value of $253,000 from Boston to Baltimore, these securities having been stolen from a broker in New York City. In the fourth count, the transportation alleged was also from Boston to Baltimore, and it was said to have occurred on or about May 1, 1968. The securities alleged to have been transported were three United States Treasury bills having an aggregate face value of $300,000 which were alleged to have been stolen from a broker in New York City.

Two of the Treasury notes alleged to have been illegally transported in the second count of the indictment were also the subject of the third count of the indictment. The latter charged that, on or about May 15, 1968, there had been a further illegal transportation of these notes, in the aggregate face amount of $200,000, from Baltimore to Washington.

Prior to trial, a severance was granted as to Mondavano. Defendant was tried alone with a jury and he was convicted on all counts. Sentenced to concurrent sentences of ten years on counts one, three and four, and a consecutive sentence of ten years on count two, he appeals. We affirm as to counts one, two and four, and reverse as to count three.

I

Defendant's specific attack on his convictions under counts one, two and four is quite limited in scope. As to each, he asserts *solely* that the evidence was insufficient to provide a factual basis from which the jury could determine beyond

---

1. The statute provides, in pertinent part: "Whoever transports in interstate * * commerce * * * securities * * * of the value of $5,000 or more, knowing the same to have been stolen * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both." 18 U.S.C.A. § 2314.

In each count each defendant was also charged with having violated this statute under 18 U.S.C.A. § 2.

a reasonable doubt that the securities stolen in New York City were transported, or caused to be transported, by him from *Boston* to *Baltimore*. Aside from the point of origin of the transportation, defendant does not dispute the sufficiency of the proof to convict him.[2] We reject defendant's contention.

■ There was no direct proof of the transportation of the securities, either as to where they were taken after being stolen in New York or from where they were brought immediately prior to their appearance in Maryland. It is well settled, however, that circumstantial evidence is enough if it satisfies the jury beyond a reasonable doubt that the interstate transportation, as alleged in the indictment, actually occurred. Bell v. United States, 185 F.2d 302, 310 (4 Cir. 1951).

We turn to the circumstantial proof which the government offered: Defendant and Mondavano were shown to be residents of Massachusetts and to be employees of the Esquire Sportmen's Club with offices in Boston. In January, 1968, they met a Baltimore real estate developer (Schwartz) and had conversations with him about developing a hotel and casino on the island of Haiti. Their conversations continued for a period of time. It was contemplated that the total development cost would be six to seven million dollars and defendant and Mondavano were to contribute approximately $1,000,000.

In April, the Baltimore developer indicated that defendant and Mondavano should begin contributing some money; and, on or about April 16, 1968, they brought the ten school bonds described in the first count of the indictment to an agent (Harrison) of the Baltimore developer. He was instructed to borrow $30,000, pledging them as security, and to retain $8,000 as an investment in the project and to give $22,000, the balance of the loan, to defendant and Mondavano. These bonds had been discovered as missing by the New York bank on February 13, 1968. There was proof of a constant flow of telephone calls from defendant's home and his office to Schwartz's home and his office and to Harrison's home and his office during the period January 31, 1968, to April 16, 1968. Specifically, on April 15, there were two calls from defendant's home and two calls from defendant's office to

2. In the section of his brief entitled "Issues Presented for Review" defendant states:

"1. Did the trial court err in overruling the motions for judgment of acquittal which were applicable to the first, second and fourth counts and were urged by appellant at the close of all the evidence? This issue is germane solely to the following essential element of each offense charged by those counts, to wit, the element involving the claim that the alleged stolen securities were transported from the specific city of Boston, Massachusetts to the specific city of Baltimore, Maryland. As to each of those counts appellant's position is that the proof totally failed to raise any jury issue as to that element and that accordingly the action of the trial court overruling those motions for judgment of acquittal deprived appellant of his right to due process guaranteed by the Fifth Amendment to the United States Constitution." And in the pertinent portions of the argument section of the brief, defendant reiterated the same statement:

"The first, second, and fourth counts of the indictment each described securities alleged to have been stolen and then averred that appellant and the co-defendant, knowing they were stolen, transported or caused them to be transported from Boston, Massachusetts to Baltimore, Maryland.

"Appellant does not challenge the sufficiency of the evidence to sustain the jury's implied findings establishing the elements of any of the offenses charged by those counts, subject to this qualification, that appellant does contend, as to each of those counts, that no evidence was adduced from which the jury could properly infer the essential pleaded element involving the claim that the securities described by those counts were transported or caused to be transported from Boston, Massachusetts, to Baltimore, Maryland.

"The Government did not adduce any direct evidence from which the jury could infer that element as to any of those counts. * * *"

Harrison's office. On April 16, there were four calls from defendant's home and his Boston office to Harrison's office.

After the April 16 transaction the parties agreed that the site of the proposed hotel and casino should be on the island of Curacao because of unfavorable political conditions in Haiti.

On May 1, 1968, defendant and Mondavano brought the securities described in the second count of the indictment to Harrison in Baltimore. Harrison was instructed to borrow $70,000 on one of the $100,000 notes. Of the proceeds of the loan, $52,000 was given to defendant and $18,000 contributed to the venture. The other securities, in the aggregate face amount of $153,000, were left in Baltimore as part of the investment. All of these securities had been discovered stolen on May 7, 1968, by the New York broker whose last record of their presence on its premises was April 10, 1968.

Again telephone records for the period April 16 through May 1 reflected a constant flow of calls from defendant's home and office to Schwartz's office and Harrison's home and office. On the day the securities were delivered in Baltimore there were three calls from defendant's office in Boston to Harrison's office in Baltimore and two calls to defendant's office in Boston from the area of Friendship International Airport outside of Baltimore.

On May 17, 1968, Mondavano came to Harrison's office in Baltimore and delivered the securities described in the fourth count of the indictment. Harrison was not in at the time; so Mondavano gave them to Harrison's secretary with instructions to deliver them to Harrison and left, stating that he was going to New York. Shortly after Harrison arrived, defendant called to confirm that the securities had been delivered. The telephone records show a call from the defendant's home and a call from his office on that date. These securities had been discovered to have been stolen from a New York broker on April 30, 1968.

Defendant testified in his own behalf. He denied ownership, possession or knowledge of the securities in question except $200,000 of Treasury notes. These, he claimed, he heard about from Harrison, who said that "somebody" had given them to Schwartz to cash in but then it was discovered that they were stolen. Harrison, according to defendant, asked defendant to say that they were his. Defendant declined to make this statement although he made general offers to help and even offered to obtain a fictitious bill of sale to support title. In the course of his testimony, much of which was incredible, he admitted coming to Baltimore on the dates in question by air and staying only a few hours.

Without objection, the jury was instructed that possession in one state of property recently stolen in another state, if not satisfactorily explained, was a circumstance from which the jury might infer and find that the person in possession knew the property to be stolen and transported or caused it to be transported in interstate commerce. Correlatively, the jury was instructed as to the meaning of "recently stolen" and told that the longer the period of time since the theft, the more doubtful becomes the inference which may reasonably be drawn from unexplained possession.

■■ The charge was a correct statement of the law. United States v. Luciano, 343 F.2d 172 (4 Cir. 1965); Maguire v. United States, 358 F.2d 442 (10 Cir. 1966); Brown v. United States, 380 F.2d 477 (10 Cir. 1967) (per curiam opinion); Grover v. United States, 183 F.2d 650 (9 Cir. 1950). Cf., Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). Given its correctness, the question we must decide is whether, on the facts here, the inference may extend to the actual transportation, or the causing to be transported, from Boston to Baltimore. We think the inference may be given this geographical scope.

True, the proof is that the various securities were stolen in New York. Direct proof of their whereabouts was lacking until they appeared in Baltimore. However, defendant and Mondavano lived in Massachusetts and had their offices in Boston. A plain pattern of dealings between Boston and Baltimore over the entire period was shown. For the first two of the three deliveries in question, defendant and Mondavano came to Baltimore and made physical delivery of the securities in Baltimore. The inescapable inference from the telephone calls is that they came by air and remained in Baltimore only briefly, and defendant voluntarily confirmed these facts. For the third delivery only Mondavano came to Baltimore, but, again, from the telephone calls and the previous pattern of conduct, the jury could infer that Mondavano transported the bonds from Boston and that defendant caused the transportation to take place. Thus, there was sufficient evidence to find defendant guilty of transporting the securities as charged in counts one and two of the indictment, and causing Mondavano to transport them as charged in count four. Although defendant sought to explain possession of the securities by denying that he had any knowledge of them, the jury was not required to accept defendant's protestations of innocence, and we have no occasion to overturn its determination of defendant's credibility.

## II

Defendant argues that the conviction on count three must be reversed because, at the time of the interstate transportation, the Treasury notes alleged to have been transported were no longer securities within the prohibition of 18 U.S.C.A. § 2314. The word "securities" as used in § 2314 is defined in 18 U.S.C.A. § 2311.[3] Treasury notes are within this definition. However, we agree with defendant's contention that after the payment, cancellation and voiding of the notes at the Baltimore branch of the Federal Reserve Bank, they no longer qualified as securities, and, accordingly a judgment of acquittal should have been entered on this count.

The evidence relevant to this count was as follows: After the defendant and Mondavano made the second delivery of securities on May 1, 1968, and before the third delivery on May 17, they made another trip to Baltimore. This trip occurred on May 14, 1968. At that time they instructed Harrison to cash one of the $100,000 Treasury notes described in the third count of the indictment. This particular note and the other $100,000 note became due and payable on May 5, 1968. Both notes were cashed at a commercial bank in Baltimore, which in turn presented them for payment to the Baltimore branch of the Federal Reserve Bank. The notes were paid by giving the commercial bank credit for the face amount of the notes.

When the commercial bank was paid, the notes were perforated, cancelled, and stamped *void*. A charge was then made by the Baltimore branch to the account of the Treasurer of the United States for the amount paid out on the notes.

On May 24, after payment and cancellation, the Treasury notes were sent from Baltimore to the Division of Retired Securities of the Treasury Department, in Washington, D. C. In Washington, the notes were put through an auditing procedure to determine whether they were genuine, properly paid and cancelled, and to insure that the notes shipped had in fact been received. If it had appeared that the notes were coun-

3. 18 U.S.C.A.:
"2311. Definitions.
As used in this chapter:
    *       *       *       *       *
'Securities' includes any note, stock, certificate, bond  *  *  *  or, in general, any instrument commonly known as a 'security'  *  *  *  or any forged, counterfeited, or spurious representation of any of the foregoing  *  *  *."

terfeit or had been paid prematurely, the charge would have been reversed, and the Treasurer's account credited for the charge made against it. The notes in this case were genuine and had matured when paid; they were never reinstated, and the charge upon the Treasury Department was not reversed. The processing of these notes was entirely in accordance with usual government accounting procedures.

The government bases its argument for affirmance in part on Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). *Pereira* held that presentation at a domestic bank of a check drawn on an out-of-state bank is sufficient to sustain conviction under § 2314. The holding was based on the "common knowledge" that checks must be sent to the drawee bank for collection. *Pereira* is distinguishable because, although there had been payment of the check, it continued to represent an obligation to pay until the drawee bank paid or dishonored it. Because of our view of this question, we do not reach the issue of whether a defendant may be charged with knowledge of government accounting procedures.

The government places additional reliance on United States v. Tippett, 353 F.2d 335, 337 (4 Cir. 1965); Herman v. United States, 289 F.2d 362 (5 Cir. 1961); and Stern v. United States, 204 F.2d 647 (6 Cir. 1953). These cases hold that the value of property measured at the time and place of theft determines whether the jurisdictional requirement of § 2314 has been met. We agree that if they had been securities at the time of shipment, the value of the notes would have been measured as of the time and in the place of theft. However, these cases do not hold that the final character of the paper is also to be determined at that point in time. Valuation at that point merely resolves an ambiguity about the time of determination of the jurisdictional amount. There was no such ambiguity in the present case. At the time of shipment, the obligation to pay had been extinguished. Nothing was due and owing, or could be due and owing, from the United States to any holder; at most, there could only be an adjustment of accounts between the Treasurer of the United States and the Federal Reserve Bank if the notes were counterfeit or improvidently paid. We, therefore, conclude that the notes were no longer "securities" within the meaning of § 2314. Defendant is entitled to reversal of his conviction on the third count and the entry of a judgment of acquittal.

### III

In the closing portion of his charge to the jury, the district judge stated: "If the accused be proved guilty, say so. If proved not guilty, say so." Defendant objected to this portion of the charge, but in his final comments to the jury, the district judge failed to correct it. Defendant contends that this remark improperly placed the burden on him to establish his innocence and that he is entitled to reversal on all counts and the award of a new trial. We disagree.

Taken literally and alone, defendant is correct that the district judge's statement might be construed by the jury to place the burden on defendant to establish his lack of guilt. Manifestly, this would be an erroneous statement of the law. However, the statement cannot be considered alone.

Prior to the sentence in question, the district judge clearly and unequivocally instructed the jury concerning the presumption of innocence which attaches to every defendant. He explained to them what constitutes a reasonable doubt and the fact that a defendant cannot be found guilty unless the jury concludes his guilt beyond a reasonable doubt. These basic concepts were repeated several times in the course of the charge. Taken as a whole, the charge was very specific in correctly stating the basic

rules by which defendant's guilt or innocence was to be determined. We are satisfied that the error in the offending phrase was harmless.[4]

Affirmed in part, reversed in part.

4. It should be noted that if the word "not" were transposed so that the phrase read "If not proved guilty, say so" there would be no error. At most, there was a slip of the tongue, but the jury could not have been misled when the correct rule had been so completely driven home to them.