**UNITED STATES of America,
Appellee,**

v.

**Herbert R. JACOBS et al., Defendants-
Appellants.**

**Nos. 543–545, Dockets 72–1897, 72–2006
and 72–2318.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1973.

Decided March 5, 1973.

John W. Nields, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Edward J. Kuriansky, and Michael B. Mukasey, Asst. U. S. Attys., of counsel), for appellee.

Henry J. Boitel, New York City (Abraham H. Brodsky, New York City, of counsel), for appellant Jacobs.

Joseph L. Belvedere, Brooklyn, N. Y., for appellant Lavelle.

J. Stanley Shaw, New York City (Jesse I. Levine, and Irving L. Weinberger, New York City, of counsel), for appellant Thaler.

Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

Appellants were tried in the District Court for the Southern District of New York before Judge Gurfein and a jury, on a six-count superseding indictment. Count I charged appellants Jacobs, Lavelle and Thaler with conspiring with David Altschul in violation of 18 U.S.C. § 371 [1] either to violate 18 U.S.C. §§ 2314 and 2315, relating, among other things, to dealings in stolen securities—in this instance United States Treasury Bills— which have moved or are to move in in-

---

1. The trial of Altschul, who was named only in the conspiracy count, was severed; he testified as a Government witness.

terstate commerce or to defraud the United States by causing treasury bills to be presented for payment, knowing that they had been stolen. Jacobs and Lavelle were convicted but Thaler was acquitted on this count. Counts Two and Three charged Jacobs, Lavelle and Thaler with substantive violations of 18 U.S.C. §§ 2314 and 2315; all were convicted on both counts. Counts Four through Seven charged Thaler with making various false material declarations before the grand jury in violation of 18 U.S.C. § 1623. He was convicted on Count Four, relating to a statement that he had not entered into a commission agreement with Altschul. He was acquitted on Counts Five and Six, which charged him with having falsely told the grand jury that Altschul had indicated to him that Jacobs was the owner of the bills and that no one had ever indicated that Jacobs was acting for anyone else, and with having falsely denied ever meeting Lavelle. Count Seven had been dismissed during the trial.

Lavelle later moved for a judgment of acquittal on the conspiracy counts and a new trial on the two substantive counts on which he had been convicted; Thaler moved for a judgment of acquittal on all counts or, in the alternative, for a new trial based, *inter alia*, on newly discovered evidence. The judge denied both motions.

Defendants received relatively light sentences—Jacobs one year and one day on each of the three counts on which he had been convicted, to be served concurrently; Lavelle, two years on each count, to be served concurrently, and a committed $10,000 fine on Count One; and Thaler, one year and one day on each of the three counts on which he had been convicted, to be served concur-

rently, and a committed $10,000 fine on Count Two.

## I. *The Evidence*

Because appellants have questioned the sufficiency of the evidence, it becomes necessary to state the facts in some detail.[2]

In early August, 1970, more than $1.5 million in United States Treasury Bills of various maturity dates were found to be missing and unaccounted for from the vaults of Brown Brothers Harriman & Co., a large New York City banking and brokerage firm. The details of this apparent theft did not appear at trial, and none of the defendants was charged with participating in it. Ten of the bills ultimately identified to be part of the Brown Brothers Harriman theft, with face (matured) values totalling $800,000, first appeared in the possession of Lavelle in mid-September, 1970.[3] Around September 15, Lavelle approached Jacobs, a long-time friend and business associate, showed him one of the bills, and suggested that Jacobs find a way to sell it. According to Jacobs, he first tried to sell the bill at his brokerage house, which declined since he had not bought it there and advised taking it to a bank. He then went to a savings bank where he maintained an account, which declined to handle the bill since it was not yet due, and advised taking it to a Federal Reserve Bank. Instead he went to the office of his attorney, David Altschul, whom he asked to find a purchaser for the bill and further bills held by Lavelle. In this or a subsequent conversation, Altschul testified, Jacobs first indicated that he expected a "commission" or finders' fee for his participation in any eventual sale.

2. This statement follows, in large part, the government's case as developed primarily from its three principal witnesses, Altschul, Hill and Brassner. In many respects the testimony of Jacobs and Thaler did not differ. With a few but significant exceptions noted below, the defendants' case did not rest so much on controvert-

ing testimony of the government witnesses as in asking the jury to draw different inferences therefrom.

3. No explanation was attempted or made at trial how Lavelle, the owner of a silk screen printing business in New Jersey, came into possession of the bills. Lavelle offered no evidence in his defense.

After Jacobs left, Altschul broached the subject of Jacobs' visit and the sale of the bills to Thaler, a lawyer and New York State Senator with whom Altschul shared office space. Thaler questioned whether the bills were legitimate, to which Altschul replied that Jacobs had gotten them from Lavelle [4] and that Jacobs said they were legitimate. The next day, Jacobs, Altschul and Thaler met in Altschul's office. Jacobs reported that Lavelle had $800,000 worth of bills which he was willing to sell for 40–50% of maturity value, including a 10% fee for the middlemen. The meeting ended with an understanding that Thaler would seek a buyer for the bills, and that the three would share the 10% fee.

With the essential agreement thus set, the next phase centered on the possibility of selling the bills to a client of Thaler named Fred Hill, a prosperous New York real estate dealer. Thaler approached Hill, a longtime friend and client, with a proposal to sell as much as $1,000,000 worth of treasury bills at a great discount. Hill initially dismissed the idea as ridiculous, reasoning that treasury bills—especially those past due —were essentially equivalents of their face value in dollar bills, and that the deal must have hidden defects. At Thaler's request, however, Hill agreed to meet with a banker to discuss the proposed transaction. On September 30, 1970, Hill and Thaler met with a Mr. Fitzgerald, vice-president of a Chemical Bank branch near Thaler's office. Thaler outlined the deal, telling Fitzgerald that he had a client who had "some problems, mental or tax-wise, I don't

know, and wants to handle this this way"; neither Thaler nor Hill, however, mentioned the size of the proposed discount. Fitzgerald, who was not called as a witness, allegedly said that sales at a discount might well be legitimate for tax or other reasons, but that Hill would in any event be adequately protected if he put the bills in for collection and delayed payment until he had himself received payment from the Treasury, thereby, as Fitzgerald thought, dispelling any possibility of the illegitimacy of the bills. They therefore agreed that Hill would leave the bills with the bank for collection; that, upon payment from the Treasury, Hill's buying price would be deposited in a joint account to be set up by Thaler and Altschul; and that the remainder—Hill's profit—would be deposited in his personal account.

Before continuing with the plan, Hill discussed the matter with another attorney and, on the basis of the latter's skepticism, had recurring doubts about the legitimacy of the deal, which he communicated to Thaler. In response and at various later times, Thaler assured Hill that he, Thaler, was personally convinced of the validity of the deal; that he had checked out the deal with a friend or friends in—indeed one of them the head of—the racket squad of a state district attorney's office; [5] and that the original seller was a wealthy client of Altschul who earned over $70,000 a year and whose family Altschul had represented for many years.

Meanwhile, Jacobs and Lavelle met with Thaler and Altschul in the latter's office.[6] Lavelle at this point delivered

4. Thaler denied that Altchul had mentioned Lavelle then or later. His version was that at all times he thought Altschul was acting solely on behalf of Jacobs, the true owner.

5. Statements of this sort were made on at least two occasions, once to Hill on October 5 and once to Hill's accountant on October 6. At trial the government called as witnesses two lawyers, each of whom testified that he had spoken informally with Thaler at a chance encounter about the hypothetical problem of disposing of

treasury bills at an undisclosed discount. Neither lawyer had had more than two years' experience in the district attorney's office—indeed, one had left that office more than two years before the meeting with Thaler, neither had been the head of the squad, and neither had any experience with stolen securities.

6. The details of this meeting appeared in Altschul's direct testimony as government witness, and were corroborated, at least to the extent of the identity of the persons present, by Jacobs on cross-examination.

the entire $800,000 worth of bills to Thaler and Altschul, and agreed upon a formula for the sale:—65% for the buyer, 25% for Lavelle, and 10% to be split among Thaler, Altschul and Jacobs.[7] Both Altschul and Jacobs testified that at no point during this meeting did either Altschul or Thaler question Lavelle about the source of the bills or his reason for selling at such a large discount.

On October 5, 1970, Thaler, carrying $350,000 of the bills, returned with Hill to the Chemical Bank branch. Hill testified that on the way, Thaler, after repeating his assurances of the legitimacy of the deal, mentioned that there was an agreement in which "he, Altschul and a middle-man" were going to split their commission.[8] At the bank the two were joined by Altschul. Hill showed the bills to Fitzgerald, who indicated that nothing appeared wrong with them on their face.[9] Hill then gave Fitzgerald a letter instructing the bank to present the treasury bills for collection, to place $280,000 of the $350,000 in expected proceeds in a joint account in the names of Thaler and Altschul, and to deposit the rest in Hill's account.[10]

The next day, October 6, 1970, Thaler and Hill placed some of the remainder of the $800,000 in bills in a safe deposit box at a branch of the Manufacturers Hanover Trust Company. Later that day, the two met with Hill's accountant who opined, as had Hill's other advisers, that the size of the discount could only indicate shady dealing. At Thaler's re-

---

As indicated in footnote 4, *supra*, this is one of the significant respects in which Thaler's version of the facts was totally at variance with the government's case. He continually emphasized that throughout the transaction he thought that Jacobs was the true owner of the bills and asserted that he neither met nor heard of Lavelle until the fraud was discovered in the summer of 1971.

7. According to Jacobs' testimony, Lavelle's original selling price for the bills was 45–50% of face value, including 10% for middlemen. This price was subsequently rejected as "too high" by Altschul in a telephone conversation with Jacobs. The final 35% figure, to include a 10% commission, was reached in a meeting among Jacobs, Altschul and Thaler. According to Jacobs, Altschul and Thaler informed him that 35% was "the best price that we could get . . . ."

8. Many of the events involving Hill were recorded in contemporaneous memoranda dictated by Hill and admitted as evidence at trial. One such memorandum contained the following sentence: "Sy [Thaler] also told me that there is a commission involved which a middleman, Altschul, and he split . . . ." During Hill's original testimony at trial, as a government witness, Hill referred to Thaler's part in the commission as a "one-third commission." Subsequently, Hill was recalled as a witness for Thaler. After stating that he had spoken with Thaler in the interim, Hill claimed that the commas in his memorandum indicated that the name "Altschul" was in apposi-

tion to the preceding "a middleman," and that Thaler had actually referred only to an agreement between Altschul and Thaler. Hill further stated that his former testimony as to a three-way split was an "error."

9. Fitzgerald did not check with the Federal Reserve System or the FBI to determine whether the bills whose numbers corresponded with the numbers on the Thaler-Altschul bills had been stolen. An employee of the New York Federal Reserve Bank, called by Thaler, testified that if a bank official were to make such a request the Reserve Bank would check the number against lists of stolen securities maintained by them. He further stated that, in general, anyone presenting a recently due treasury bill at the Reserve Bank would be paid immediately without a check against the lists, provided that the bill appeared valid on its face.

10. The reason for the discrepancy between those percentages and the earlier instructions that only Hill's buying price should be placed in the joint Altschul-Thaler account is explained below.

As will also appear later, in neither stage of the sale of the bills was Thaler content with one-third of the 10% commission. Apparently without the knowledge of Altschul or the other participants, Thaler on October 5 also signed an agreement with Hill that he would share equally in Hill's 65% profit. Hill testified that Thaler was to place his one-third of the 10% commission in the pot that was to be so divided.

quest and in order to calm Hill's fears, Altschul wrote a Hill a letter indicating that he knew Jacobs and his family well.[11]

On October 7, 1970 Fitzgerald advised Hill that the Treasury Department would not accept the past due bills [12] without receiving a certificate of ownership. Two days later, Thaler and Hill delivered a completed certificate, prepared by Thaler and signed by Hill, showing that Hill had purchased the bills from Altschul. This document, *the only communication ever submitted by defendants to the Treasury Department*, indicated that Hill had purchased $250,000 of bills for $225,000—a discount of only 10% as against the 20% reflected in Hill's letter of instructions to Fitzgerald and the intended 65%. At the same time they left a further $150,000 in November 5, 1970, bills for collection, raising to $500,000 the maturity value of bills left with the bank. About the same time, Thaler prepared on Altschul's letterhead two letter agreements between Altschul and Hill covering the ten bills. The first letter, dated October 5, 1970, covered $250,000 in past due bills at a purported purchase price of $225,000, and thus conformed with the information on the certificate of ownership; the second, dated October 13, 1970,[13] referred to a sale of bills, some past due and some unmatured, totaling $550,000 at a purchase price of $55,000. The two letters together thus reflected a total sale of $800,000 in bills

at a price of $280,000, or 35% of face value. Both letters were eventually signed by Altschul and Hill.

According to Jacobs' and Altschul's testimony, Jacobs, Altschul and Thaler also met on October 8, 1970, and signed a written agreement to share equally a 10% commission on the sale of the bills. Each party received a signed original of the agreement.[14]

On October 14, Fitzgerald informed Hill that Altschul, the listed source of Hill's treasury bills, would also have to file a certificate of ownership for the $250,000 in past due bills first put in for collection. Hill called Thaler, who in turn relayed the information to Altschul. Altschul agreed to sign the needed certificate; however, when he and Thaler approached Jacobs with a similar request, apparently reasoning that a certificate from him would ultimately be called for, Jacobs refused. Thaler reported this development to Hill by telling him that *Altschul* refused to sign a certificate, and suggested that the prearranged deal might continue with respect to the $250,000 in unmatured, November 5, 1970, bills (for which, apparently, no certificate of ownership would be required). Hill at first accepted the revised plan, and the $250,000 in past due bills deposited with the bank (together with $300,000 in bills still held by Thaler) were returned to Jacobs and Lavelle. However, before the unmatured bills remaining with the bank were actually presented for collection, Hill's sense fi-

---

11. Although there was no explicit testimony as to the purpose of this maneuver, it is apparent from the record that Hill believed Jacobs to be the true owner of the bills and that Thaler and Altschul intended him to think this. At one point, according to Hill's testimony, Hill was in Thaler's office on unrelated business when Jacobs happened to be visiting Altschul. Hill testified that Altschul introduced Jacobs as the man Altschul "got the Treasury Bills from." If the testimony of Altschul and Jacobs was credited, Thaler knew this to be grossly misleading.

12. Three of the treasury bills involved in the transaction, totaling $250,000 in face value, were due on November 5, 1970.

The other seven bills, totaling $550,000 in face value (including $250,000 worth of the bills originally deposited with the Chemical Bank), had become due on September 3, 1970.

13. Altschul testified that both letters were presented to him on the same day, and that he did not assist in their preparation.

14. As will appear in more detail in Point V below, a photocopy of Jacobs' signed original unexpectedly appeared at trial as the government's much-discussed Exhibit 57–A. Thaler insisted that no agreement was ever made or signed and that the photocopy was a forgery.

nally asserted itself and, deciding that "the failure to supply the affidavit was a sure sign of something being wrong somewhere," he rescinded the whole deal. On October 22, 1970, Hill withdrew the $250,000 in November 5 bills from the bank and delivered them to Thaler and Altschul in return for a letter from Altschul acknowledging that "all of our transactions relating to United States Treasury Bills are at an end."

Thus frustrated in their first attempt, and newly aware of the relative difficulty in collecting past due bills without extensive documentation, the conspirators sought an alternative means of cashing the $250,000 in November 5 bills before the due date. Sometime prior to November 4, 1970, Thaler approached a friend and client named Jules Brassner, an art dealer and lighting fixtures manufacturer. Thaler told Brassner an essentially similar but less complete version of the story earlier told Hill: Thaler and his associate, Altschul, knew a "Park Avenue millionaire" who wanted to sell $250,000 worth of treasury bills at a 50% discount; if Brassner would only deposit the bills (which, he was told, were "the same thing as American currency, as your dollar bill"), he and Thaler could share equally in the 50% profit thus generated. Upon Brassner's agreement to the plan, Thaler informed Altschul, who in turn procured from Jacobs the three unmatured bills totalling $250,000 in face value. On November 4,

1970, Altschul, at Thaler's request, signed a bill of sale from himself to Brassner for the bills at a purchase price of $117,000.[15] The next day, Thaler and Brassner entered into a written agreement, prepared by Thaler, in which they agreed to share equally in the profits from the sale and that Thaler's share would be distributed according to his instructions.[16] Thaler then delivered the treasury bills to Brassner. Apparently to the surprise of Thaler and, so far as the testimony reveals, utterly without any knowledge on the part of the other conspirators, Brassner subsequently [17] took the bills to his bank in Connecticut and put them in for collection. Within a week they were paid.[18]

The remaining task was the pleasant one of distributing the profits. This, as other aspects of the transaction, took a rather complex form. On November 17, 1970, Brassner, at Thaler's request, wrote a check to Altschul for $117,000, the agreed purchase price. In addition, Brassner wrote Thaler three checks totaling $66,500,[19] representing Thaler's half of the $133,000 profit generated by the sale.[20] On the same day, Thaler delivered the $117,000 check to Altschul, who deposited it in his special attorney's account, and subsequently drew a series of eight checks to Thaler, Jacobs (part of which was intended to go to Lavelle) and himself.[21] Jacobs deposited a check

---

15. The $117,000 figure—which allowed a slightly greater discount than the 50% originally mentioned to Brassner, but was substantially short of the 65% to which the conspirators had earlier agreed—apparently was selected by Thaler alone. As will appear below, see note 21 *infra*, the disparity allowed Thaler and Altschul to increase their yields.

16. See note 10, *supra*.

17. Only two of the three bills handled by Brassner were deposited for collection on November 5. In spite of the fears resulting from the earlier request for a certificate of ownership for past due bills, Brassner deposited the third bill on November 12 and collected it without difficulty.

18. No reason for this fateful trip across the state line appears in the testimony. Brassner testified that he had substantial business interests and at least one bank account in New York City.

19. Only two of these checks were made out directly to the order of Thaler. A third was made out to Parke-Bernet Galleries for Thaler's use in purchasing a Corot painting.

20. Neither Brassner nor Altschul knew that Thaler had been sharing profits with the other. This fact appeared to each only after the investigation into these events began in the summer of 1971.

21. Calculation of the total profits received by each party to the transaction is compli-

for $62,500 representing Lavelle's share in his own personal checking account and thereafter wrote out a check to Lavelle for the same amount. Apparently this check was deposited by Lavelle in his own account. Two days later, however, Lavelle, pursuant to a procedure earlier arranged by Jacobs, made out a check of his own for $62,500 to one Ben Schneider, an accountant acquaintance of Jacobs. Schneider, together with Jacobs' brother Donald and Lavelle,[22] went to Schneider's bank where Schneider deposited Lavelle's check, drew a check on himself for $62,500 in cash, counted out 10% ($6,250) to himself as a commission for cashing the check, and turned the remainder over to Lavelle.[23] ·

During the summer of 1971 the three treasury bills collected by Brassner in November, 1970, were at long last determined by the Treasury Department to be stolen, and investigation traced the chain of possession to the defendants. In late July, Thaler and other defendants were interviewed by representatives of Brown Brothers Harriman's insurance company and of the FBI, two of whom testified for the government. In September and November, 1971, Thaler was called before a grand jury to testify concerning his role in the disposition of the bills. In addition to asserting, as he did throughout the investigations and subsequently would do during the trial, that he had no idea that the bills were stolen and always thought Jacobs to be the owner, on September 24 Thaler categorically denied ever having met or heard of Lavelle in the fall of 1970 and further stated flatly that he had not signed a written agreement (or had an agreement of any sort) with Jacobs and Altschul or either of them.

## II. *Sufficiency of Evidence of Theft.*

■ To take first things first, appellants attack the convictions on the conspiracy and substantive counts on the ground of insufficiency of the evidence to show that the treasury bills were in fact stolen from Brown Brothers Harriman, as distinguished from having accidentally disappeared. But we have held under this very statute that "unexplained disappearance of carefully-handled, closely-guarded documents suffices to support an inference of theft." United States v. Izzi, 427 F.2d 293, 297 (2 Cir.), cert. denied, 399 U.S. 928, 90 S.Ct. 2244, 26 L.Ed.2d 794 (1970). See also United States v. Owens, 420 F.2d 305 (2 Cir. 1970). And in United States v. Fistel, 460 F.2d 157, 162–163 (2 Cir. 1972), we applied that same principle to a statute, 18 U.S.C. § 2113(c), which im-

cated by the fact that some parties were paid according to the original 65–25–10 ratio, whereas others received increased payments reflecting the fact that Brassner made only a 53.2% profit. Lavelle was paid $62,500 representing 25% of the $250,000 collected. Jacobs was paid $8,334 as his third of the 10% commission. Altschul, who must have known upon receiving Brassner's check that the bills had been sold for only $117,000, eventually received $19,333, and Thaler's share of the "commission" totaled $26,833. The size of the last two shares (the distribution of which extended into February, 1971) was known only to Altschul and Thaler themselves. Thus, including Thaler's share in Brassner's profits, the final distribution (but see note 23 *infra*) was as follows:

| | |
|---|---|
| Thaler | $93,333 |
| Brassner | 66,500 |
| Lavelle | 62,500 |
| Altschul | 19,333 |
| Jacobs | 8,334 |

22. Schneider testified that Donald Jacobs introduced a man named Lavelle. He could not, however, swear that the "Lavelle" he then met was the same as the defendant Lavelle who appeared in court. But it is undisputed that the defendant Michael Lavelle wrote the check to Schneider which the latter deposited.

23. Schneider testified that when he asked Jacobs why he did not cash the check himself, Jacobs replied, "Better you shouldn't know." Jacobs subsequently denied having made this statement, and testified further that he did not realize that the $62,500 which he arranged to cash for Lavelle represented the same $62,500 he had given Lavelle two days earlier. He admitted, however, receiving $3,000 for arranging the transaction.

posed the arguably stricter test of proof that property had been "taken" from a bank. Appellants' first contention thus fails.

### III. Sufficiency of Evidence of Guilty Knowledge.

■ Appellants' claim of insufficiency of evidence to prove guilty knowledge could be rejected simply on the basis of the long established rule that

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence.

Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896)—a principle we have often applied. *See, e. g.,* United States v. De-Sisto, 329 F.2d 929, 935 (2 Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); United States v. Izzi, *supra,* 427 F.2d at 297. Moreover, the government in this case introduced substantial evidence to rebut the defendants' attempts to demonstrate innocent possession.

So far as concerns Thaler, the record not only was sufficient for a finding of guilty knowledge but fairly shrieked of it. We start with an attorney, who at the time was a member of the New York State Senate's Committee on Banking, allegedly believing that the lawful holder of treasury bills, matured or about to mature, would sell them at a discount, not of 10%, although even that would be hard to understand, but of 65%! His explanation that he believed this might be done for tax reasons increases rather than removes the inference of guilty knowledge;[24] even a lawyer not expert in the intricacies of tax law must know

that no net savings can be accomplished by selling at $35 securities that must have cost $100 or close to it and could be collected or sold for that amount. Thaler knew that Hill's lawyer and accountant thought the transaction most suspicious, yet he closed his eyes to all the storm signals so apparent to them. The alleged consultations with the assistant district attorneys again make the case worse rather than better; the jury was entitled to believe these off-the-cuff conversations with lawyers whose only qualification was their present or past official position were designed only to beguile Hill, to provide the facade of a defense if the shady dealings were discovered, or both. Perhaps most damning of all was the concoction of a certificate to be presented to the Treasury which showed a discount of only 10%, and the preparation of the letter agreements of October 5 and 13, one showing a 10% discount on the $250,000 of past due bills and the other of 90% on $550,000 of other bills. Beyond all these facts and others is the simple but devastating question: With all the suspicious circumstances here present and the doubts expressed by Hill's lawyer and accountant, why did not Thaler take one of the simple means that would have led to revelation of the truth? Thus far, it should be noted, we have cited only facts which Thaler admitted or were established by uncontroverted proof. But the jury was also entitled to draw inferences from such matters as Thaler's denial of an agreement with Jacobs and Altschul (and, in his grand jury testimony, even of an agreement with Altschul) when, apart from all else, the division of the proceeds demonstrated the contrary, and indeed from the many contradictions between Thaler's testimony and that of other witnesses.

As against all this, Thaler's counter-arguments that if he had guilty knowledge, he would not have gone to the

---

24. This is true notwithstanding the soothing remarks by Fitzgerald. The latter was not told that the discount was to be 65%, and an attorney does not need guidance from a bank manager on the significance of an offer to dispose of treasury bills for 35% of what the Treasury would pay.

Chemical Bank, dealt with so many people, or left so much in the way of written evidence fall exceedingly flat. It was at Hill's insistence that he and Thaler went to the Chemical Bank, and the use of checks rather than cash is easily explicable on the basis that a demand for the latter would have created more doubt in the already doubting Hill as well as in the incredibly complacent Fitzgerald and even the rather eager Brassner. We could go on with Thaler's admissions and untrue statements to the insurance and FBI investigators and other matters, but it is kinder not to do so.

While the evidence supporting the inference of guilty knowledge recognized in the *Wilson* case, *supra,* 162 U.S. at 619, 16 S.Ct. 895, was not so overwhelming in the cases of Lavelle and Jacobs, it was strong indeed. Lavelle, a small businessman, suddenly turns up in possession, not of a few cartons of radios, but of $800,000 of treasury bills some two months after they had been stolen. Such possession, soon after theft of the bills, itself was circumstantial evidence of knowledge that they were stolen. United States v. Izzi, *supra,* 427 F.2d at 297. Instead of attempting to cash them directly, the normal course if believed he was the lawful owner, he goes to his friend Jacobs. When Jacobs asks the source, Lavelle says it is not Jacobs' concern. Jacobs proceeds nonetheless. When he finds himself unable to dispose of the first bill through his broker or savings bank, he disregards the advice to go to the Federal Reserve Bank but consults Altschul. He then enters in negotiations which lead to an agreement for the sale of matured or maturing treasury bills at a price which would yield Lavelle only 25% of their face value! Yet Lavelle and Jacobs, while perhaps not so sophisticated as Altschul and Thaler, were businessmen, not school children; the nature of a treasury bill is not so arcane as to lie beyond common understanding. Beyond all this is the series of complex maneuvers in connection with the final distribtion, along with Jacobs' extraordinary testimony that he did not associate Lavelle's $62,500 check to Schneider with his earlier check of precisely the same amount to Lavelle, and what Schneider testified to have been his answer to the inquiry why he did not cash Lavelle's check himself: "Better you shouldn't know." Better the jury could have found, indeed. Appellants' arguments that perhaps Lavelle's maneuvers, and Jacobs' assistance in them, might have been due to a desire by Lavelle to cheat his wife or the Internal Revenue Service rather than to conceal the proceeds of a sale of stolen securities were for the jury.

## IV. *The Conspiracy Count.*

The most serious legal questions raised on appeal concern the sufficiency of the evidence to sustain the conspiracy count and the judge's instructions thereon.[25]

The parties are in agreement on one point. Although Brassner's transportation of the treasury bills to Connecticut sufficed for appellants' convictions on the substantive counts, even though this was unexpected by appellants, United States v. Crimmins, 123

---

25. Although only Lavelle and Jacobs were convicted of conspiracy, Thaler urges that if the Government failed to establish a conspiracy within 18 U.S.C. § 371, much of the evidence against him was erroneously admitted. In view of our conclusions we need not dissect the evidence to determine how much, if any, consisted of declarations, the admissibility of which would hinge on proof of conspiracy, as distinguished from acts, see Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct.

481, 97 L.Ed. 593 (1953), or consider whether proof of an agreement to effect a criminal act would not suffice to invoke the hearsay exception for declarations of a conspirator in furtherance of the conspiracy even though the agreement was not within the *federal* conspiracy statute. *Cf.* United States v. Annunziato, 293 F. 2d 373, 380 n. 4 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

F.2d 271 (2 Cir. 1941); United States v. Vilhotti, 452 F.2d 1186 (2 Cir. 1971), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972), it would not, under the rule in this circuit,[26] sustain a conviction for conspiracy to cause the bonds to be transported in interstate commerce. Judge L. Hand made the point in *Crimmins, supra,* 123 F.2d at 273, with customary incisiveness:

> While one may, for instance, be guilty of running past a traffic light of whose existence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past.

Judge Gurfein made this completely clear to the jury.

The court submitted the conspiracy charge on two theories. One was that the jury might find that a purpose of the conspiracy was to cause the treasury bills to be transported to Washington, D. C., for payment by the Treasurer of the United States. The other was that the jury might conclude that an objective of the conspiracy was "to defraud the United States, or any agency thereof in any manner or for any purpose," 18 U.S.C. § 371, to wit, by causing payment of the treasury bills to be made to someone not the rightful owner.

■ We are unable to sustain the former theory. The bills say on their face that they are payable on presentation "to the Treasurer of the United States *or to any Federal Reserve Bank.*" (Emphasis supplied.) All the testimony was to the effect that the defendants meant to use the latter method of collection; indeed we should suppose that direct presentation to the Treasurer was quite unusual. The manager of the government bond department of the Federal

Reserve Bank of New York testified that if a treasury bill is paid, whether at a window or by credit to a member bank, the Federal Reserve Bank charges the Treasurer, perforates and voids the bill, and sends it to Washington in that condition. In United States v. Teresa, 420 F.2d 13, 17 (4 Cir. 1969), cert. denied, 397 U.S. 1063, 90 S.Ct. 1498, 25 L. Ed.2d 684 (1970), the court held that causing bills to be transported to Washington in such condition would not be a substantive violation of 18 U.S.C. § 2314 since they would no longer be "securities," as that term is defined in 18 U.S. C. § 2311. Not disputing the correctness of that holding, the government urges that "in a conspiracy count such as is involved here, the only question is what the parties contemplated not what actually occurred," and that, as is rather obviously true, the defendants knew nothing of the Federal Reserve Bank's procedure for perforation and voiding. While it is quite possible, although not entirely clear, that conspirators may be found guilty of conspiracy when the object of their agreement is legally or factually impossible, *compare* Beddow v. United States, 70 F.2d 674 (8 Cir. 1934), *with* Ventimiglia v. United States, 242 F.2d 620, 625–626 (4 Cir. 1957),[27] the government's case was nonetheless wanting. Even on the government's theory, there would have to be evidence tending to prove that defendants *thought* that the bills would travel to Washington as "securities," and of this there was none.

■ On the other hand, the jury could properly have found defendants guilty of conspiracy to defraud the United States. Both the Supreme Court and this court have given a broad construction to this phrase in what is now 18 U S.C. § 371. See Haas v. Henkel, 216 U

---

26. This is criticized in Developments in the Law—Criminal Conspiracy, 72 Harv.L. Rev. 920, 937–39 (1959).

27. Developments in the Law, *supra,* 72 Harv.L.Rev. at 945, concludes that neither the defense of impossibility of fact nor of

impossibility of law is consistent with the rationale of the law of conspiracy. According to LaFave & Scott, Criminal Law 474–76 (1972), "the conspiracy cases have usually gone the simple route of holding that impossibility of any kind is not a defense."

S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); Hammerschmidt v. United States, 265 U.S. 182, 187–189, 44 S.Ct. 511, 68 L.Ed. 968 (1924); United States v. Johnson, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); United States v. Peltz, 433 F.2d 48, 51–52 (2 Cir. 1970), cert. denied, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971). Defendants argue that no fraud was committed since the United States could not have suffered pecuniary loss from paying the stolen bearer bills. Although under the law in effect in 1970 the government was obliged to pay the owner of a bearer bond that had disappeared if the facts "in the judgment of the Secretary [of the Treasury] would indicate that it has been destroyed or irretrievably lost . . . and will never become the basis of a valid claim against the United States", 31 U.S.C. § 738a(a)(1) (1970), and although Brown Brothers Harriman may have been repaid pursuant thereto, the statute required the posting of an indemnity bond, 31 U.S.C. § 738a(b). But this takes too narrow a view of the conspiracy statute's reach. Apart from the time and trouble imposed by having to investigate the owner's claim, to effectuate payment and to obtain indemnity (with the possibility of defenses such as undue delay in discovery of the fraud), "[i]t is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated . . . ." Hammerschmidt v. United States, *supra,* 265 U.S. at 188, 44 S.Ct. at 512. Raising funds and controlling the supply of money through the issuance and redemption of short-term bearer bills clearly reflect "legitimate official action and purpose" of the United States, and just as clearly these are defeated when the government pays someone who has obtained one of its obligations from a thief.

■ At first blush our finding of error in the transportation-to-Washington theory would seem to require a reversal at least of Jacobs' and Lavelle's conviction on the conspiracy count; whether still other reversals would be required would depend on the considerations mentioned in note 25, *supra,* and on the continued vitality of the concurrent sentence doctrine in the wake of Benton v. Maryland, 395 U.S. 784, 787–791, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), but see United States v. Febre, 425 F.2d 107, 113 (2 Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970); *see generally,* Note, The Federal Concurrent Sentence Doctrine, 70 Colum.L.Rev. 1098, 1108–1117 (1970). For the general principle is that, as stated in Nicola v. United States, 72 F.2d 780, 787 (3 Cir. 1934): "When two instructions are given to the jury, one erroneous and prejudicial and the other correct, it is impossible to tell which one the jury followed and it constitutes reversible error." See also Mills v. United States, 164 U.S. 644, 17 S.Ct. 210, 41 L.Ed. 584 (1897) ("Which of the two statements was received and acted upon by the jury it is wholly impossible for this court to determine; and, as one of them was erroneous . . . the judgment . . . must be reversed . . . ."); Frank v. United States, 220 F.2d 559 (10 Cir. 1955); Smith v. United States, 230 F.2d 935 (6 Cir. 1956). *Cf.* Leary v. United States, 395 U.S. 6, 31–32, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

■ However, this case falls outside the general rule. If the jury found a conspiracy on what we deem the erroneous view that the evidence supported a conclusion that Lavelle and Jacobs had entered into an agreement to have stolen treasury bills transported to Washington for payment by the United States, it would have found every element necessary to support a conclusion that the defendants had entered into an agreement to defraud the United States by causing it to redeem the bills from a recipient from a thief rather than from the rightful owner. Whether the jury found Lavelle and Jacobs guilty on the first theory submitted to it, or on the second, or on both, there is thus no uncertainty that the jury found every fact necessary

for a valid conviction under 18 U.S.C. § 371. Compare United States v. Bottone, 365 F.2d 389, 394–395 (2 Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L. Ed.2d 437 (1966).[28]

## V. *Government's Exhibit 57–A.*

An important point in the government's case on the conspiracy and substantive counts was that Thaler, Altschul and Jacobs had entered into an agreement for a three-way division of the 10% commission to be paid by La-velle. This negated Thaler's claim that he had supposed Jacobs, a long-time client of Altschul, to be the owner. Moreover, the existence of such an agreement was the basis for Count Four, a false statement to the grand jury, on which Thaler was convicted.

As indicated above, Altschul and Jacobs testified that an oral agreement to this effect was reached in Altschul's office the day after Jacobs had first approached Altschul,[29] and that on October 8 the agreement had been put in writing and signed, with each of the three receiving an original, Jacobs' and Altschul's being on onionskin paper. They also testified that, after the collapse of the dealings with Hill and the realization of the difficulty in disposing of the entire $800,000 of treasury bills, Thaler asked Altschul, and Altschul asked Jacobs to return their signed originals for

destruction and that they complied—thereby permitting Thaler to do away with what he thought to be the only written evidence of his knowledge that Jacobs was only a middleman.

At the request of the court and in order to lay the basis for testimony by Jacobs as to the contents of the agreement, the prosecutor in cross-examining Jacobs brought out the facts with respect to the destruction of his original. He then inquired whether that was Jacobs' only copy. To everyone's surprise, Jacobs answered in the negative. Jacobs went on to say that he had made a photocopy around the time he had received the original, had kept it in his file, and now had it in his pocket. It then turned out that Jacobs had made another photocopy in the courthouse that morning. The first photocopy became Government Exhibit 57–A for identification, which was ultimately received in evidence;[30] the second photocopy became Government Exhibit 57 for identification, was left in Jacobs' possession and was destroyed by him after the trial.

Although, in the astonishment created by Jacobs' production of the copies, Thaler's counsel understandably did not object to the admission of Exhibit 57–A, he later moved to strike it, citing 4 Wigmore, Evidence § 1198 (3d ed. 1940), for the proposition that a proponent's inten-

---

28. It is plain that the acquittal of Thaler on the conspiracy count does not invalidate the use against him of declarations of conspirators in furtherance of the conspiracy. Admissibility of such declarations hinged on whether in the view of the trial judge "the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Geaney, 417 F.2d 1116, 1120 (2 Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Judge Gurfein was amply justified in concluding that the evidence with respect to Thaler's participation met this test.

29. Hill's testimony and written memoranda strongly corroborated the existence of the agreement. See note 8, *supra.*

30. The text of the exhibit reads as follows:

> October 5, 1970
> Referring to letter dated October 5, 1970, relating to $800,000.00 of treasury bills, the undersigned agree that the sum of $80,000.00 shall be divided equally by and between the undersigned and that David Altschul and Seymour R. Thaler shall issue checks from an escrow account to be opened in the Chase Manhattan Bank, 43rd Street and Fifth Avenue Branch, to each of the undersigned for one-third of the same sum of $80,000.00 within ten days after each of the said treasury bills become due and payable.

Underneath are lines containing purported signatures of Altschul, Thaler and Jacobs, with their names typed below.

tional destruction of a document bars him from offering a copy. The judge denied the motion.

 Wigmore's full text gives reason enough:

> If it should appear that the party desiring to prove a document had himself destroyed it, with the object of preventing its production in court, the evidence of its contents, which he might then offer, could properly be regarded as in all likelihood false or misleading (*ante*, § 291). It is with this extreme case in mind that a few Courts have inconsiderately laid down an unconditional rule that the proponent's intentional destruction of the document *bars him from evidencing its contents* in any other way
>
> . . . .
>
> But it is obvious that there may be many cases of intentional destruction which do not present the above extreme features. The intentional destruction may clearly appear to have been natural and proper, or it may be merely open to the bare suspicion of fraudulent suppression; and in such cases the evidence of its contents should be received, subject to comment on the circumstances. . . .
>
> The view now generally accepted is that (1) a destruction in the ordinary course of business, and, of course, a destruction by mistake, is sufficient to allow the contents to be shown as in other cases of loss, and that (2) a destruction otherwise made will equally suffice, provided the proponent first removes, to the satisfaction of the judge, any reasonable suspicion of fraud. The precedents, however, are not harmonious. (Emphasis in the original.)

It is clear that Wigmore did not favor but strongly opposed the absolute view for which Thaler contends, and did not consider it to be the law. Even if this had been an action between Jacobs and Thaler, the court could properly have found that Jacobs had removed "any reasonable suspicion of fraud" with respect to the destruction of the originals; both he and Altschul testified it was Thaler, not Jacobs, who had demanded this. Compare United States v. Knohl, 379 F.2d 427, 439–441 (2 Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L. Ed.2d 465 (1967). However, even if Jacobs had taken the initiative in proposing destruction of the originals, we see no reason why this should preclude the government from offering a copy as secondary evidence if it succeeded in discovering one—any more than it would be precluded from proving the contents of the agreement by oral evidence.[31]

 Receipt of Exhibit 57–A in evidence did not, of course, prevent Thaler from challenging its authenticity.[32] He did this in several ways. He claimed that the October 5 date was inconsistent with other testimony, and there was no letter of October 5 "relating to $800,000 of treasury bills," and pointed to the reference to an account in the Chase Manhattan rather than the Chemical Bank. Altschul's and Thaler's secretaries testified that they had not typed the agreement. The defense called a witness to testify that in October, 1970, Jacobs worked for Crown Fabrics on the third and fourth floors of a building on West 40th Street, and that the photocopying machines on those floors were Royfax machines. A witness from Royfax who, although not an expert, was allowed, so far as concerned Thaler, to

31. Determination of the preliminary issue whether the government should be permitted to offer a copy of the agreement was for the judge. Morgan, Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv. L.Rev. 165 (1929); McCormick, Evidence § 53, at 120 (Clearly ed. 1972). After having denied the motion to strike, the judge charged the jury that if they found Jacobs had destroyed the original for a fraudulent purpose, they should disregard

Exhibit 57–A. Apart from the lack of objection to the judge's submitting this issue to the jury, unnecessarily giving Thaler a second bite at the apple was surely not prejudicial to him.

32. Thaler's basic contention was that Exhibit 57–A was a "mock-up" produced by typing a fabricated agreement above purported signatures (obtained in some way not indicated) and then making a photocopy.

give his opinion, testified that the paper in Exhibit 57–A was not of the sort that Royfax had supplied at the time. Also the defense brought out that, in early appearances before the grand jury and in talks with the insurance company and FBI investigators, Jacobs had not mentioned a *written* agreement, although in later grand jury testimony and at trial he had insisted that there was one. The judge put all of this fairly to the jury. Although this was done in the portion of the charge on the count accusing Thaler of having falsely denied the existence of a three-way agreement when testifying before the grand jury, no objection was made on that score and the jury must surely have understood the instruction to relate to the authenticity of Exhibit 57–A for all purposes.

 Thaler's motion for a new trial was based primarily[33] on further expert evidence about Exhibit 57–A, which it had allegedly been impossible to assemble in the closing days of the trial. He presented an affidavit of a document expert showing, quite persuasively, that the original of the photocopy was typed on Altschul's typewriter[34] and a detailed affidavit of a research chemist who was manager of Royfax' research and development department in 1970 categorically stating that the paper in Exhibit 57–A was not of any of the types which Royfax was furnishing its customers at the time. The first point was scarcely material. No one had suggested that the typing was done elsewhere than in the Altschul-Thaler suite, and it was for the jury to weigh the reliability of the testimony of the two secretaries and, even if this was deemed reliable, to consider whether the agreement could have been typed by someone else.[35] The evidence with respect to the paper is more troubling. However, Jacobs' trial testimony as to where the photocopy had been made was equivocal. Moreover, Thaler had been allowed to introduce some evidence that the paper was not of the sort Royfax was then supplying, and his counsel did not then indicate that he was dissatisfied or desired a continuance. In view of all this and the overwhelming evidence of Thaler's guilt, denial of the new trial motion without an evidentiary hearing was not an abuse of discretion.[36]

33. The only other basis was an affidavit of Lavelle that he had met Thaler only once, "in or about September, 1970" when Lavelle was in Altschul's office with Altschul and Jacobs. According to the affidavit, all that happened was that Thaler was passing the door and Altschul called him in to shake hands with Lavelle. The judge thought this evidence would not be material in view of the jury's having acquitted Thaler on Count Six of the indictment, which charged that Thaler had lied to the grand jury in saying he had never met Lavelle. We are not so sure about the propriety of drawing inferences from this verdict. But we fully agree with the judge's alternative ground, that a court must exercise great caution in considering evidence to be "newly discovered" when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify. This is so even if, as alleged, counsel for the co-defendant making a post-trial affidavit exculpating the movant had not allowed the affiant to be interviewed prior to trial.

34. The initial affidavit also asserted that comparison of the type with one document dated October 6, 1970 and another dated February 4, 1972, indicated that Exhibit 57–A was typed after the October 6 document and at a time nearer that of the February 4, 1972 letter. However, a later affidavit confessed that further investigation with respect to the date, based on examination of additional specimen, "has proved inconclusive."

35. Thaler's argument that the expert evidence contradicted Altschul's testimony that Thaler prepared the agreement is unimpressive in view of the testimony that the two typewriters were available to all in the office.

36. Thaler again raises questions, as he did on a motion for remand addressed to an earlier panel, about the government's allowing Jacobs to retain Exhibit 57 for identification, which Jacobs subsequently destroyed. Although it would have been much better for the government to have retained custody of this exhibit, there is nothing to suggest that the prosecution had reason to suppose Jacobs would destroy it. Neither has there been any clear indication what purpose would be served if it were still available for examination.

VI. *The Charge with Respect to Guilty Knowledge.*

■ Appellants attack the charge with respect to guilty knowledge, which we reproduce in the margin.[37] Their criticisms are particularly directed to the last sentence of the third paragraph.

The sentence is drawn from the definition of knowledge in the American Law Institute's Model Penal Code § 2.-02(7) (Proposed Official Draft, 1962). This received at least nodding approval in Leary v. United States, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) and perhaps more than that in Turner v. United States, 396 U.S. 398, 416 & n. 29, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), although in neither case did the trial judge use the definition in a charge. This court has also voiced approval of the definition in United States v. Matalon, 425 F.2d 70 (2 Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L. Ed.2d 76 (1970); United States v. Squires, 440 F.2d 859, 863 (2 Cir. 1971); and United States v. Sarantos, 455 F.2d 877, 880–882 (2 Cir. 1972), although again in none of these was the "high probability" language actually charged. But a good definition, like the language of a sound judicial opinion, see Lisansky v. United States, 31 F.2d 846, 852 (4 Cir.) (Parker, J.), cert. denied, 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008 (1929) is not necessarily appropriate as a charge, and we can think of cases where sole reliance on the ALI language might be improper. The comments to the section (Tent.Draft No. 4, 1955) state that the provision was drafted to reach situations where the actor consciously shuts his eyes to avoid knowing whether or not he is committing unlawful acts, *cf.* United States v. Benjamin, 328 F.2d 854, 862–863 (2 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L. Ed.2d 497 (1964), and language of this sort would often be more useful to a jury than the "high probability . . . unless he actually believed" formulation. But here the judge did not simply charge the Model Penal Code definition. He carefully explicated that although "it is not necessary that the Government prove to a certainty that a defendant knew the bills were stolen," on the other hand "[g]uilty knowledge cannot be established by merely demonstrating negligence or even foolishness on the part of a defendant." And he emphasized the elements of deliberate closing of the eyes to what would otherwise have been obvious and "reckless disre-

---

37. The third element of the offense is that the defendant knew that the Treasury Bills had been stolen. Knowledge is not something that you can see with the eye or touch with the finger. It is seldom possible to prove it by direct evidence. The government relies largely on circumstantial evidence in this case to establish knowledge.

In deciding whether a particular defendant under consideration by you knew the bills were stolen you should consider all the circumstances, such as how the defendant handled the transaction, how he conducted himself. Do his actions betray guilty knowledge that he was dealing with stolen securities or are his actions those of a duped, innocent man?

Guilty knowledge cannot be established by demonstrating merely negligence or even foolishness on the part of a defendant. However, it is not necessary that the government prove to a certainty that a defendant knew the bills were stolen. Such knowledge is established if the defendant was aware of a high probability that the bills were stolen, unless the defendant actually believed that the bills were not stolen.

Knowledge that the goods have been stolen may be inferred from circumstances that would convince a man of ordinary intelligence that this is the fact. The element of knowledge may be satisfied by proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him.

Thus if you find that a defendant acted with reckless disregard of whether the bills were stolen and with a conscious purpose to avoid learning the truth the requirement of knowledge would be satisfied, unless the defendant actually believed they were not stolen.

Furthermore, I instruct you that proof of a sale and purchase at a substantially discounted price permits an inference that the parties to the transaction knew of the illicit character of the items sold.

You should scrutinize the entire conduct of the defendant at or near the time the offenses are alleged to have been committed.

gard of whether the bills were stolen and with a conscious purpose to avoid learning the truth . . . ." The charge thus differed greatly from that found erroneous in United States v. Fields, 466 F.2d 119 (2 Cir. 1972), involving a comparable knowledge requirement under 18 U.S.C. § 659. There the trial judge charged that the "government need not prove that the defendant knew it was stolen property," but need only adduce "evidence, circumstantial or otherwise, [which] tends to prove knowledge . . . ." While the "tends to prove" language might effectively lower the government's burden of persuasion, such was not the case with the charge used here. The jurors in this case were made well aware that they had to find either that the defendants actually knew the bills had been stolen or had manifested by their conduct that they were deliberately shutting their eyes to what they had every reason to believe to be the fact.

The few other points advanced by defendants do not merit discussion.

The judgments of conviction and the order denying the motions of Thaler and Lavelle for a new trial are affirmed.